[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 1.]

FINDLAY/HANCOCK COUNTY BAR ASSOCIATION *v.* FILKINS.

[Cite as *Findlay/Hancock Cty. Bar Assn. v. Filkins*, 2000-Ohio-491.]

*Attorneys at law—Misconduct—Charges against attorney dismissed when relator fails to prove alleged disciplinary violations by clear and convincing evidence.*

(No. 99-2233—Submitted March 8, 2000—Decided September 6, 2000.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 98-16.

_____

{¶ 1} Relator, Findlay/Hancock County Bar Association, filed a complaint against respondent, John C. Filkins III of Findlay, Ohio, Attorney Registration No. 0046671. The complaint alleged that respondent violated DR 4-101(B)(2), 7-102(A)(3), (4), (5), (6), (7), and (8), as well as 1-102(A)(1).

{¶ 2} This disciplinary action arose from respondent's representation of Traci Mackey. Traci Mackey (f.k.a. Traci Crow) and Russell Crow were married on November 24, 1990. During their marriage, they had a son, Reid Crow. At the time, Traci Mackey and Russell Crow also had custody of two other children, Chontay (Russell Crow's daughter from a prior marriage) and Aaron (Traci's Crow's son from a prior relationship).

{¶ 3} Chontay's biological mother and Russell Crow's ex-wife, Rochelle Baumlein, filed a motion seeking custody of Chontay. Respondent defended the custody action. On October 10, 1991, the trial judge issued an entry ordering psychological evaluations for the parties (Russell and Rochelle), their spouses (Traci Mackey and Michael Baumlein), and Chontay. Dr. Frederick P. Ferri conducted the examinations and authored a report recommending that Chontay

remain with Russell and Traci Crow. Ultimately, Russell Crow was successful in retaining custody of Chontay.

{¶ 4} In June 1993, respondent represented both Russell Crow and Traci Mackey in attempting to get visitation rights to Russell Crow's niece, Ashley. The case was subsequently dismissed.

{¶ 5} Traci Mackey also retained respondent's services to determine the identity of her biological parents, as well as her family medical history. On December 16, 1993, respondent filed a petition for release of this information with the Court of Common Pleas of Highland County, Probate Division. Ultimately, respondent was unsuccessful in acquiring the information for Traci Mackey because her biological parents had not authorized a release of their identity.

{¶ 6} Having become unhappy with their marriage, Traci Mackey hired Robroy Crow (*no* relation to Russell Crow) to initiate divorce proceedings against her husband, Russell Crow. On November 6, 1995, Traci Mackey commenced a divorce action in the Court of Common Pleas of Hancock County. Respondent represented Russell Crow in the divorce action. The couple settled most issues pertaining to the divorce except custody of their child, Reid. On September 12, 1996, subsequent to a hearing before a magistrate, the trial court issued an entry that granted the divorce and gave custody of Reid Crow to Russell Crow. The court ordered Traci Mackey to pay Russell Crow child support.

{¶ 7} Subsequent to the divorce, the Hancock County Child Support Enforcement Agency filed a "show cause" motion relating to the child support order against Traci Mackey for Reid Crow. Traci Mackey hired attorney Barbara Larick to represent her in this matter. Respondent continued to represent Russell Crow. Larick filed a motion to modify custody. Upon learning that respondent had represented Traci Mackey prior to his representation of Russell Crow in the divorce action against Mackey, Larick advised Traci Mackey that she might want to

consider filing a disciplinary complaint or filing a malpractice action against respondent.

{¶ 8} On October 17, 1997, Traci Mackey filed a grievance against respondent. On April 6, 1998, the relator filed a complaint alleging that respondent used confidences learned from Traci Mackey during his representation of her to her disadvantage in violation of DR 4-101(B)(2).[1] Eight months later, on December 10, 1998, relator filed an amended complaint, containing two new allegations. The first new allegation arose from the Chontay custody case and alleged that respondent had instructed Traci Mackey "not to disclose to the psychologist the physical, mental, and sexual abuses that Mackey had suffered and was suffering from Russell A. Crow," and further "to lie to the psychologist about the relationship between Russell A. Crow and her." The second new allegation was that respondent had "established signals with Mackey through which he would instruct her during the course of her testimony before the Court as to how to answer the questions posed to her by him and by opposing counsel." These instances of misconduct were alleged to be in violation of DR 7-102(A)(3), (4), (5), (6), (7), and (8). Mackey also filed a legal malpractice suit against both respondent and Robroy Crow.

{¶ 9} A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court heard the evidence. The panel found that the relator failed to prove by clear and convincing evidence (1) that respondent had knowingly concealed that which he was required to disclose or made a false statement in violation of DR 7-102(A)(3) and (5); and (2) that respondent used signals to instruct Traci Mackey how to answer questions in violation of DR 7-102(A)(4) and (8). However, the panel determined that the relator did prove by clear and convincing evidence that (1) respondent had instructed Traci Mackey not to disclose to the psychologist in the Chontay custody case that she (Traci) had been abused by her

---

1. The complaint also alleged that respondent violated DR 1-102(A)(1). DR 1-102(A)(1) merely precludes a lawyer from violating a Disciplinary Rule.

husband Russell Crow, in violation of DR 7-102(A)(6) and (7); and that (2) respondent knowingly used a confidence or secret of his client, Traci Mackey, to her disadvantage in violation of DR 4-101(B)(2).

{¶ 10} The panel recommended that respondent be suspended from the practice of law for one year with six months stayed. The board adopted the findings of fact and conclusions of law of the panel, but recommended that respondent be suspended for two years, with one year stayed, and that respondent be placed on probation.

_____

*Roger Miller* and *Mark Miller*, for relator.

*John C. Filkins III; Kegler, Brown, Hill & Ritter* and *Geoffrey Stern,* for respondent.

_____

**LUNDBERG STRATTON, J.**

{¶ 11} "In disciplinary proceedings, the relator bears the burden of proving the facts necessary to establish a violation. The complaint must allege the specific misconduct that violates the Disciplinary Rules and *relator must prove such misconduct by clear and convincing evidence*." (Emphasis added.) *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, at paragraph two of the syllabus. While the Board of Commissioners on Grievances and Discipline makes recommendations to this court, it is this court that renders the final determination of the facts and conclusions of law in disciplinary proceedings. *Id.* at paragraph one of the syllabus.

{¶ 12} This is a difficult case to decide because it relies solely on the credibility of the witnesses for proof. Upon independent review of all the evidence in this case, we agree with the board that there is insufficient evidence to prove (1) that respondent violated DR 7-102(A)(3) and (5) (he lied or concealed information), and (2) that respondent violated DR 7-102(A)(4) and (8) (he used signals to

influence his client's testimony). However, contrary to the board's findings, we find that relator did not prove by clear and convincing evidence that (1) respondent violated DR 7-102(A)(6) and (7) (he instructed his client to lie) or (2) that respondent violated DR 4-101(B)(2) (he used client confidences to the disadvantage of the client).

{¶ 13} We find that there is evidence in the record that undermines the credibility of Traci Mackey's testimony. In addition, we find that there is no evidence to corroborate her testimony, while there are multiple credible witnesses whose testimony supports respondent. We do not lightly disregard the findings of the panel. They are conscientious and dedicated individuals who had an opportunity to see and hear the witnesses and to judge their credibility. However, we also recognize that we must make the final determination using the clear-and-convincing-evidence standard.

### DR 7-102(A)(6) and (7)

{¶ 14} The board found that respondent violated DR 7-102(A)(6) and (7) when he instructed Traci Mackey not to disclose relevant and truthful information in an effort to prevail in the Chontay custody motion. DR 7-102(A)(6) and (7) state that an attorney shall not "[p]articipate in the creation or preservation of evidence when he knows * * * that the evidence is false" and shall not "[c]ounsel * * * his client in conduct that the lawyer knows to be * * * fraudulent."

#### a. Summary of Relator's Evidence

{¶ 15} In her testimony before the panel, Traci Mackey alleged that in 1992, just prior to the psychological evaluation ordered in the Chontay custody case, she disclosed to respondent that she, Chontay, and Aaron had been abused by her husband, Russell Crow. The allegations included sexual abuse of Traci Mackey and Chontay and physical abuse of Traci Mackey, Chontay, and Aaron, including attacks against Traci Mackey with a knife and a chair. She alleged that Russell Crow's abuse was documented in written police reports.

**{¶ 16}** Traci Mackey testified that she disclosed the abuse allegations to respondent at his office and her home. She testified that she discussed the abuse with respondent "many times." "Usually they [the conversations] took place over the phone and then I would go see him." Traci Mackey admitted that she did not have a driver's license but claimed that friends drove her to respondent's office on those occasions when she went to discuss Russell Crow's abusive nature.

**{¶ 17}** Despite the alleged disclosure of Russell Crow's abuse to respondent, Traci Mackey alleged that respondent instructed her to lie to the doctor and tell him that Russell Crow was a "wonderful father, that he had a wonderful relationship with the kids."

**{¶ 18}** Finally, Traci Mackey testified that she also described Russell Crow's abusive nature to Robroy Crow, the attorney who represented her in her divorce from Russell Crow.

b. Summary of Respondent's Evidence

**{¶ 19}** In support of respondent, Russell Crow, Traci Mackey's ex-husband, testified that respondent never instructed him or Traci Mackey to lie to the doctor conducting the psychiatric evaluation. In fact, Russell Crow testified that respondent instructed him and Traci Mackey "to be honest with the doctor, tell him the truth." Russell Crow also testified that respondent never came to their (Russell and Traci Crow's) house for a meeting. He also testified that he was the only person to drive Traci to respondent's office because she had no friends in the area to give her rides to respondent's office.

**{¶ 20}** Respondent testified on his own behalf. Respondent stated that Traci Mackey "never" indicated to him that Russell Crow was abusive. He also testified that he never counseled Traci Mackey to lie in the psychological evaluation. Respondent testified that he never met with Traci Mackey alone before the divorce action. Finally, he testified that he had never met Traci Mackey at her residence.

{¶ 21} Robroy Crow testified that contrary to Traci Mackey's assertion, she never disclosed to him that Russell Crow had abused her. He also testified that had he been aware of any abuse, he would have attempted to introduce it in the divorce case.

c. Analysis

{¶ 22} Traci Mackey's testimony is the sole evidence in support of the DR 7-102(A)(6) and (7) violations. The board found that "[h]er testimony was too detailed and specific not to be found to be credible." However, we find that the record reveals information that we believe erodes the credibility of her testimony. This, in conjunction with the testimony of three witnesses that directly contradicts Traci Mackey's testimony, leads us to determine that the evidence is not clear and convincing that respondent violated DR 7-102(A)(6) or (7).

{¶ 23} Traci Mackey admitted to the panel that she lied to the examining psychologist in the Chontay custody case about Russell Crow's alleged abuse, even though she knew that a lie would keep Chontay with this allegedly abusive man. Relator's counsel asked Traci Mackey, "did you, in fact, lie in those psychological evaluations?" She answered, "Yes."

{¶ 24} Traci Mackey also admitted to the panel that she had lied under oath in a court of law. Specifically, a member of the panel posed the following question: "The signals, were those signals ever intended for you to lie on the witness stand?" She answered, "I did lie."

{¶ 25} Traci Mackey admitted that she lied on several other occasions. She admitted that she lied to her husband about an affair that she was having with Dwayne Mackey. It is apparent from the record that she lied to Deborah Mackey, Dwayne Mackey's wife, about her affair with Dwayne Mackey. In fact, Traci Mackey persuaded Deborah Mackey to let her move in with Deborah and Dwayne, claiming that Russell Crow had assaulted her, even though Traci Mackey had been having an affair for several months with Deborah Mackey's husband. She engaged

in further deception by having Deborah Mackey baby-sit her children while she and Deborah Mackey's husband would go to a motel and engage in sex.

{¶ 26} Traci Mackey's admission of the aforementioned lies erodes her credibility with regard to her allegations against respondent. The lies she admitted to in her divorce case were of a particularly deceptive nature. Yet even more detrimental to her credibility were her admitted lies that occurred in court, where a person is sworn to tell the truth, and in the court-related psychiatric examination.

{¶ 27} We also find that the record reveals that Traci Mackey has a propensity for making unsubstantiated allegations. She alleged that Russell Crow abused her, Chontay, and Reid, as well as her son Aaron. However, to date, nothing in the record indicates that any of these claims have been substantiated. In fact, at one point, Children's Services directed her to stop bringing Chontay into the hospital for exams based on these unsubstantiated allegations because doing so was abusive in and of itself to Chontay.

{¶ 28} Finally, Traci Mackey accused Rochelle Baumline of being racist and of threatening to run someone over with a car. Again these allegations are unsubstantiated by the record. We find that Traci Mackey's propensity for making unsubstantiated allegations further erodes her credibility.

{¶ 29} Traci Mackey filed her grievance against respondent on October 17, 1997. The relator filed the initial complaint on April 6, 1998. It alleged that respondent used confidences gained by him to Traci Mackey's disadvantage in violation of DR 4-101(B)(2). It was not until eight months after the initial complaint, and fourteen months after the filing of the grievance, on December 10, 1998, that relator filed an amended complaint with the additional allegations that respondent had instructed Traci Mackey to lie.[2]

---

2. The amended complaint also alleged that respondent used signals to instruct Mackey how to testify, a violation of DR 7-102(A)(4), (6), and (7). However, because we have affirmed the board's finding that there was insufficient evidence to prove this charge and because we are addressing the

{¶ 30} The allegation that respondent instructed Mackey to lie arose from respondent's representation of Traci Mackey in the early 1990s. We find it suspect that Traci Mackey apparently failed to disclose or remember this allegation until eight months after the initial complaint was filed and some fourteen months after the grievance was filed.

{¶ 31} An allegation of counseling a client to lie is not an insignificant charge that the accuser would disregard or forget. Yet the claim was not asserted until fourteen months after the initial grievance was filed.

{¶ 32} A divorce strains emotions, especially where a parent loses custody of a child. Traci Mackey had just been through a divorce and lost custody of her son, Reid, to her ex-husband, Russell Crow. Such emotions could have motivated Traci Mackey to seek retribution. Thus, Traci Mackey had a motive to fabricate the allegations against respondent. This could explain why Traci Mackey did not file the allegation that respondent lied until some fourteen months after she filed her initial grievance. It would also explain the malpractice action she filed against respondent because much as a criminal verdict may support a civil action for damages, a successful disciplinary action may support a malpractice action for damages.

{¶ 33} We find that the fourteen-month delay in asserting these additional allegations, with no justification for the delay, further erodes Traci Mackey's credibility with regard to the allegations that respondent instructed her to lie.

{¶ 34} Finally, Traci Mackey's testimony made reference to two separate instances that we believe provided the relator with a prime opportunity to bolster her testimony with probative, corroborative evidence. The first instance pertained to her testimony that she first divulged and subsequently discussed Russell Crow's abusive nature to respondent at his office. Traci Mackey admitted that she had to

---

allegations that respondent counseled Mackey to lie, we find no reason to further discuss this allegation here.

rely on friends to give her a ride to respondent's office because her driver's license was expired. However, Russell Crow testified that he was her only ride to respondent's office. And respondent testified that he never met with Traci Mackey alone. Relator had a prime opportunity to impeach the testimony of respondent's witnesses' testimony by presenting a witness who would testify that he or she chauffeured Traci Mackey to respondent's office as she claimed. However, relator provided no such witness(es).

{¶ 35} Traci Mackey also testified that written police reports were made pertaining to Russell Crow's abusive episodes. Yet the relator failed to submit a single copy of a police report in this regard or provide any explanation as to why such documentation was unavailable. Copies of police reports would have verified Russell Crow's abusive nature and in turn supported Traci Mackey's testimony that she divulged this critical information to respondent and Robroy Crow.

{¶ 36} Contrary to relator's case, we find the witnesses testifying in support of respondent to be credible. These witnesses included respondent, Russell Crow, and Robroy Crow.

{¶ 37} Respondent presented his own case to this court and emphatically denied that he had counseled Traci Mackey to lie. In addition to these assertions, respondent presented several witnesses that testified favorably to respondent's credibility and reputation. Attorney R. Edward Marks of Advocates for Basic Legal Equality, Inc. ("ABLE") testified as to respondent's reputation. Marks, who operated ABLE's legal aid program, made numerous referrals to respondent and had received positive evaluations. Marks testified that he found respondent to have a "high reputation for personal integrity and professional competence."

{¶ 38} Doug Bonnoront, a personal friend and client of respondent, testified that respondent was trustworthy and "very ethical."

{¶ 39} Bruce Brimley, acting municipal court judge and respondent's current employer, testified: "I guess in sum, if I didn't believe in John's integrity

and John's honesty, I would not be here testifying on his behalf and he would not be working for me and I think the fact that he works for me testifies as to my opinion as to his integrity, his candor and his honesty."

**{¶ 40}** Finally, respondent submitted several letters from peers, from a common pleas judge, and a former employer that praise respondent's honesty, integrity, and high moral ethics.

**{¶ 41}** In an apparent attempt to discredit respondent, the relator presented the testimony of attorney Patti Baumgartner-Novak. She testified that respondent can be difficult at times and will fight in cases where others would settle. She stated that not many attorneys litigate cases to trial in Hancock County but admitted that respondent had a duty to go to trial if his client did not want to settle. She also testified about an incident where she suspected that respondent had advised two of his clients not to return a child to Ohio even though he was under a court order to do so. However, she admitted that respondent, on record, denied giving that advice. No proof or evidence was ever presented that respondent had not been truthful and Baumgartner-Novak conceded that she had never heard anyone say that respondent was dishonest.

**{¶ 42}** Barbara Larick also testified to another incident where she felt that respondent acted in a case with a possible conflict of interest. But she admitted that respondent withdrew after she challenged him on the issue.

**{¶ 43}** While Baumgartner-Novak and other witnesses challenged respondent's style of practice, neither she nor any of relator's witnesses presented any evidence to attack respondent's credibility, the issue at stake here.

**{¶ 44}** Having observed his demeanor in presenting his case before this court, we find respondent's testimony credible. Respondent's credibility is bolstered by the testimony and letters of his employers, friends, and colleagues and by relator's failure to successfully attack respondent's credibility.

**{¶ 45}** Russell Crow testified that respondent told him and Traci to tell the truth to the doctor conducting the psychological examination in the Chontay case. His testimony corroborates respondent's testimony in this regard.

**{¶ 46}** However, perhaps the most persuasive testimony was that of attorney Robroy Crow. In our view, he provided key testimony, because it corroborates respondent's testimony that Traci Mackey never disclosed Russell Crow's abuse. Yet the panel never addressed why they disregarded Robroy Crow's testimony.

**{¶ 47}** Traci Mackey alleged that during her divorce case, she disclosed Russell Crow's abuse to Robroy Crow, but that Robroy Crow told her that "it was irrelevant * * * because of the circumstances surrounding the divorce, that I would lose anyway." However, Robroy Crow testified that Traci Mackey never told him that Russell Crow was abusive. He indicated that had he known of the abuse, he would have used the evidence in the divorce proceedings.

**{¶ 48}** Robroy Crow is an attorney experienced in domestic law. Thus, he knew the value of this information in winning Traci Mackey custody of her son and his obligation as an attorney to use it. There is no credible evidence in the record as to why Robroy Crow would advise Traci Mackey that Russell Crow's abusive nature was irrelevant to determination of the custody of their son, which would have been a blatant violation of his obligation to her. In fact, upon direct examination of Traci Mackey in the divorce proceeding, Robroy Crow made a detailed inquiry as to Russell Crow's fitness as a father, giving Traci Mackey a golden opportunity to expose the abuse. Yet, the only faults as a father that she testified to were that he slept too much and occasionally failed to put shoes or socks on their child.[3] Because Traci Mackey failed to testify as to Russell Crow's abuse,

---

3. Deborah Mackey relates one incident that occurred after Traci Mackey started her affair with Dwayne Mackey in which Traci alleged that her husband, Russell Crow, "beat her up." However, Russell Crow conveys a much different account of that event. Moreover, if all the alleged abuse did indeed occur it makes no sense that Deborah Mackey would relate this single incident to the

especially when the custody of her son was at stake, we are inclined to believe that she either did not tell Robroy Crow of Russell Crow's abuse or that in fact Russell Crow was not abusive. Under either scenario, Robroy Crow was unaware of any abuse inflicted by Russell Crow. Such a conclusion only corroborates respondent's position that Traci Mackey never disclosed Russell Crow's alleged abusive nature to him either.

{¶ 49} Accordingly, we find that Robroy Crow's testimony that Traci Mackey never informed him of Russell Crow's alleged abuse was credible. This conclusion tends to discount the allegation that Russell Crow was abusive and strikes another blow against Traci Mackey's credibility.

{¶ 50} Finally, and perhaps more persuasive than our individual analysis of each witness's credibility, is the collective effect of the testimony presented by respondent compared to the relator's case, which relied almost solely on the testimony of Traci Mackey. Respondent and Robroy Crow testified that Traci Mackey never informed them of the alleged abuse. Neither recalled having seen any abuse marks on Traci Mackey's body, which she alleged were visible when she spoke to both of them. Both respondent and Robroy Crow would have known the importance of the abuse and their obligation to disclose it in their respective cases, but each failed to do so despite the fact that they could have disclosed it easily.

{¶ 51} In weighing the evidence, we note that respondent presented three witnesses who testified that respondent did not violate DR 7-102(A)(6) or (7). The credibility of these witnesses was never effectively impeached. Their testimony was consistent and appealed to logic and common sense. Conversely, relator relied primarily upon a single witness to prove that respondent violated DR 7-102(A)(6) and (7). There are many questions pertaining to the credibility, logic, and common sense of her testimony, as well as a failure to corroborate several key portions of

exclusion of arguably more grave alleged previous incidents of sexual and physical abuse against Traci Mackey and her children, including the alleged attack with a knife.

her testimony. Thus, we are compelled to find that relator failed to present clear and convincing evidence that respondent violated DR 7-102(A)(6) or (7).

DR 4-101(B)(2)

{¶ 52} The board also found that "Respondent violated DR 4-101(B)(2) when he used confidential information that he knew regarding Traci Mackey, especially her relationship with her children, and other relationships, in seeking to obtain custody of the child born of her marriage with Russell Crow." DR 4-101(B)(2) prohibits an attorney from "[using] a confidence or secret of his client to the disadvantage of the client."

a. Summary of Relator's Evidence

{¶ 53} In her testimony before the panel, referring to the period of time prior to the divorce, Traci Mackey stated that "Mr. Filkins [respondent] and Rusty [Russell Crow] and I, we, all of the, well, a lot of meetings we had, it wasn't just attorney-client go ins, do your business and leave. I mean, we talked about friends, we talked about his wife, she was going to have a baby at that time." Traci Mackey confirmed that many of the conversations with respondent were social in nature, pertaining to their children, soccer, and the birth of respondent's child.

{¶ 54} In answering a question about what confidences imparted to respondent were used by him in representing Russell Crow in the divorce, Traci Mackey stated, "Well, everything, I think, was used against me in the divorce. Mr. Filkins knew about, like I said, everything about me. He knew everything about my children. He knew, you know, if I would lose one of my children I would be devastated. He knew everything and I believe he used everything he had against me, every ounce of me." When asked by a member of the panel to be more specific, she stated, "I'm going to have to say it would be, again, that my children are very important to me because during recess of that case there was a threat made from John Filkins to Robroy Crow stating that if I didn't stop with trying to get custody

14

away from Rusty that I would pay and that I would lose my son and that was my threat, so that he knew how to threaten me by using my children."

### b. Summary of Respondent's Evidence

**{¶ 55}** When asked what confidences he used against Traci Mackey, respondent testified, "[A]s I sit here today, I can't tell you of any." Robroy Crow also indicated that he did not believe that respondent used any confidences.

### c. Analysis

**{¶ 56}** The vague allegation that "he used everything he had against me" is unsupported by any specifics in the record. Although there is no definition of "confidence" as the term is used in DR 4-101(B)(2), the following two cases provide some guidance as to its meaning. In *Stark Cty. Bar Assn. v. Osborne* (1982), 1 Ohio St.3d 140, 1 OBR 175, 438 N.E.2d 114, the court held that the respondent used a confidence to his own advantage in violation of DR 4-101(B)(3). In *Osborne*, the respondent and his client transacted several business deals between them. The respondent in effect represented himself as well as his client in these deals, and the client lost money. Although the court never identified a specific confidence that respondent used to his advantage, the violation was evident. It is virtually axiomatic that where an attorney represents himself and his client in a business deal, and the client loses money on the deal, a presumption arises that the attorney used client confidences to his client's disadvantage.

**{¶ 57}** In *Greater Cleveland Bar Assn. v. Watkins* (1981), 68 Ohio St.2d 11, 22 O.O.3d 125, 427 N.E.2d 516, the respondent attorney used his client's confidence to his own advantage in violation of DR 4-101(B)(3). In *Watkins,* a fee disagreement prompted respondent's client to file a grievance with the bar association. During the investigation of the grievance, respondent called the client's employer, told him that he knew of the employer's "under the table" payments to the client, and threatened to go to the authorities unless the grievance was dropped. The information that the client had been paid under the table had

been imparted to the respondent in his role as attorney and was used against the client. Thus, respondent was found to have violated DR 4-101(B)(3).

{¶ 58} Unlike *Osborne* and *Watkins,* the "confidences" Traci Mackey identifies in her testimony are merely generic statements of her love for her children, which could apply to virtually any parent. Further, the fact that a client cherishes his or her child is hardly the sort of information that can be used in a custody case to the disadvantage of the client. Therefore, we decline to define the broad statements identified by Mackey as "confidences" for purposes of DR 4-101(B)(2).

{¶ 59} During her divorce with Russell Crow, Traci Mackey petitioned the court to issue a shared-parenting plan for Reid. A review of the transcript of the divorce proceeding reveals that respondent never used any of the "confidences" identified by Mackey in the divorce proceeding.

{¶ 60} In sum, we can find no specific fact or information that would have come from respondent's prior representation of Traci Mackey that was used as the basis for Reid Crow's custody determination. No references were made to the custody battle for Chontay. No information, history, doctor or psychology reports from the prior three matters were ever mentioned; all of the questioning by respondent dealt with Traci Mackey's then-current lifestyle and plans for work and child care.

{¶ 61} In addition, attorney Robroy Crow, who represented Traci Mackey, presented an affidavit, which stated:

"4. That Affiant did not regard any prior and terminated representation by [respondent] as an issue to be raised in the case *Traci Lynn Crow vs Russell Alan Crow.*

"5. That Affiant never saw, believed, or concluded that [respondent] had any confidential information about Traci Lynn Crow which could be considered detrimental to Traci Lynn Crow in the case, *Traci Lynn Crow vs Russell Alan Crow.*

16

"6. To the best of Affiant's knowledge and belief, [respondent] did not use any confidential information about Traci Lynn Crow to the disadvantage or prejudice of Traci Lynn Crow in the case, *Traci Lynn Crow vs Russell Alan Crow.*"

**{¶ 62}** Robroy Crow, Traci Mackey's attorney in her divorce proceeding, was in the best position to evaluate the evidence and determine whether his opponent had used confidential information. Respondent testified that he disclosed his prior representation of Traci Mackey to Robroy Crow and that Traci Mackey had no issue with respondent representing Russell Crow. Relator never refuted this. However, the panel seemed to totally ignore this evidence.

**{¶ 63}** Instead, the panel apparently relied in part on the testimony of attorney Barbara Larick as corroborating Traci Mackey's testimony. However, an examination of Barbara Larick's testimony is not persuasive on the issue.

**{¶ 64}** On direct examination, Larick stated:

"I said something to John about, how can you do this? Don't you have an obligation to zealously represent your client and use everything that you could possibly use and he said, I did use everything. He said, why do you think we won in the prior divorce case, he got custody, meaning that Mr. Crow had gotten custody of the couple's son, Reed [*sic*] Allen Crow, in the divorce matter."

**{¶ 65}** However, on cross-examination, Barbara Larick backtracked:

"A. He didn't say I had used, that he had used everything. He just said, I did use—I said, how can you use the information and he said, I did use it, why do you think we won, he got custody, didn't he?

" * * *

"Q. I think you've already said this, I want to make sure I heard. Mr. Filkins did not detail this information to you [*i.e.*, the information he knew as a result of representing Traci]?

"A. No. Mr. Filkins did not detail the information."

**{¶ 66}** Larick interprets respondent's remark to mean that he used confidential information. Yet it is clear from her testimony that Larick does not have any personal knowledge that respondent used any confidences against Traci Mackey. The respondent could just as easily have been referring to the evidence in the divorce case.

**{¶ 67}** In fact, in awarding custody of Reid to Russell Crow, the magistrate in his decision stated:

"The parties have, at times, demonstrated the ability to work together on parenting issues. This is evidenced by the parties trying different parenting arrangements on their own. Ultimately, however, this proved to be unsuccessful and resulted in conflict. The Plaintiff [Traci Mackey] will be moving in the next couple of weeks. Although she will be less than an hour and one-half from Defendant [Russell Crow], this will also make shared parenting difficult.

"The child has lived most of his young life in Findlay, most recently in the marital home where the Defendant continues to reside. He attends day care in Findlay. His extended family is in the Findlay area. The Plaintiff is moving to Port Clinton, Ohio, to get a new start. This move would require the child to move to a new city, away from his day care, away from his father, and away from extended family.

"The Plaintiff stated she is moving to get a fresh start. She plans at some time to be residing with her boyfriend. The Plaintiff did not explain how this could be construed to be in Reid's best interests. She, herself, stated that Reid will be harmed by such a move. She also admitted putting her own interests ahead of those of her children. It also appears that the Plaintiff will have limited time available to parent Reid. She plans on working at a day care, starting in the early morning, and she also has a restaurant job in the evening. The Plaintiff stated she was not sure how she was going to combine this employment. The Plaintiff will be doing all this while pursuing a new relationship with another man. Although the Plaintiff

18

will be at the day care center when Reid is there as a cook [*sic*], she will have limited contact with him during the day.

"The Plaintiff's shared parenting plan is found not to be in Reid's best interests. The Defendant should be designated as the residential parent for Reid."

{¶ 68} None of the reasons delineated in the magistrate's decision in awarding custody of Reid to Russell Crow corresponds with the "confidences" that Traci Mackey identified in her testimony. Further, the reasons cited by the magistrate (Traci Mackey's move, her affair, her employment plans) were not known to respondent before he represented Russell Crow in his divorce from Traci Mackey.

{¶ 69} In addition, respondent testified that he revealed his prior representation of Traci Mackey to Robroy Crow and received clearance for him to represent Russell Crow in the divorce proceeding. Robroy Crow testified that respondent did not disclose any of Traci Mackey's "confidences" in the divorce proceedings.

{¶ 70} Barbara Larick's conclusory statement, standing alone, does not rise to the level of clear and convincing evidence that respondent violated any client confidences when compared to the testimony of Robroy Crow, who was in the best position to know the facts. While the better practice would have been to decline to further represent Russell Crow in the subsequent divorce, these facts simply do not rise to the level of a Disciplinary Rule violation. And in fact, once Barbara Larick did raise the issue when Traci Mackey moved for a change of custody, respondent promptly withdrew. As he explained in his testimony:

"There was also a Motion filed by Traci's counsel at that point, Barbara Larick, to have me withdrawn as counsel on Russ's behalf.

"I would have spoken with Russ and would have indicated to him, in essence, I don't want this to be a distraction from your issue. I don't want my representation to detract from your seeking to continue as residential parent and the

best way to do that at this point is for you to obtain other counsel. I don't want this to become an issue about me versus an issue about you being residential parent."

**{¶ 71}** For all the aforementioned reasons, we find that relator has failed to prove that respondent violated DR 4-101(B)(2) by clear and convincing evidence.

**{¶ 72}** Accordingly, because we find that relator has failed to prove the alleged disciplinary violations by clear and convincing evidence, we decline to accept the recommendation of the board and dismiss the charges against respondent.

*Cause dismissed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

DOUGLAS, J., concurs in judgment.

_____