[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 191.]

CLEVELAND BAR ASSOCIATION *v.* CLEARY.

[Cite as *Cleveland Bar Assn. v. Cleary*, 2001-Ohio-1326.]

*Judges—Misconduct—Six-month suspension—Extending a sentencing quid pro quo to a pregnant defendant based on judge's opposition to abortion— Judge acts in a manner "prejudicial to the administration of justice" within meaning of DR 1-102(A)(5), when.*

(No. 01-412—Submitted May 30, 2001—Decided September 19, 2001.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 00-22.

———————————

SYLLABUS OF THE COURT

A judge acts in a manner "prejudicial to the administration of justice" within the meaning of DR 1-102(A)(5) when the judge engages in conduct that would appear to an objective observer to be unjudicial and prejudicial to the public esteem for the judicial office.

———————————

COOK, J.

{¶ 1} The Board of Commissioners on Grievances and Discipline ("board") of the Supreme Court has filed a certified report recommending that this court sanction the respondent, Patricia A. Cleary, Attorney Registration No. 0024286, for acts of professional misconduct committed while Cleary was a sitting judge on the Cuyahoga County Court of Common Pleas. For the reasons that follow, we adopt the board's findings of fact and conclusions of law and suspend Cleary from the practice of law for six months.

I

{¶ 2} In August 1998, twenty-one-year-old Yuriko Kawaguchi appeared before Cleary and entered a guilty plea to one count of fifth-degree felony forgery stemming from her use of a counterfeit credit card to purchase thousands of dollars worth of merchandise from Cleveland-area electronics stores. Kawaguchi, a California resident and Japanese citizen, had traveled to Cleveland with two companions as part of a scheme to purchase electronics equipment with counterfeit credit cards from several stores nationwide. In exchange for Kawaguchi's guilty plea and her agreement to testify against her co-conspirators, the state nolled the remaining counts of its indictment against her. The state had originally charged Kawaguchi with twenty-seven felony counts, including numerous theft counts and one count of engaging in a pattern of corrupt activity. Cleary accepted Kawaguchi's plea and scheduled the matter for sentencing at a later date.

{¶ 3} About two weeks before her sentencing hearing, Kawaguchi wrote a letter to Judge Cleary from the Cuyahoga County Jail. In the letter, Kawaguchi revealed that she was pregnant, a fact she had learned two months after her arrest, and expressed a desire to obtain an abortion. In the letter, she begged Judge Cleary either to "grant me probation and let me go home to have the abortion or let me bond out to have the procedure done in Cleveland."

{¶ 4} On October 6, 1998, Kawaguchi appeared at her sentencing hearing with her attorney, Anthony Vegh. In light of Kawaguchi's lack of a prior criminal record and Kawaguchi's compliance with the terms of her plea agreement, Vegh asked the court to "place her on probation and allow her to transfer that probation to California."[1] Neither Vegh nor Kawaguchi, who spoke on her own behalf, mentioned Kawaguchi's pregnancy. Following Kawaguchi's statement to the

_____

1. Effective July 1, 1996, "community control sanctions" replaced what had formerly been known as "probation" as a possible sentence under Ohio's felony sentencing law. Compare R.C. 2929.15 with former R.C. 2951.02. Vegh and Cleary testified during the hearing that attorneys and judges still use the term "probation" as a shorthand for community control sanctions.

court, however, Judge Cleary steered the hearing to the subject of Kawaguchi's pregnancy and engaged in the following discussion with Kawaguchi and Vegh:

"THE COURT: And would you be placing your child—if I place you on probation, there's the problem of you serving probation here in the state of Ohio.

"You also represent a flight risk, too, on the west coast, and you are not an American citizen.

"Would you be placing your child up for adoption here in the state of Ohio or in California?

"THE DEFENDANT: At this time, I would be staying in the state of Ohio temporarily at a friend's house. I do hope that in the future I could go back and transfer back to California.

"THE COURT: With regard to your child, though, would you be placing your child or keeping your child?

"I think you indicated in some of your letters to me, when you discussed this subject, what you would be doing with your child.

"Would you be placing the child up for adoption here in Ohio?

"I'm trying to work out my time frame if I would place you on probation.

"THE DEFENDANT: Well, honestly, your Honor, I'm pretty much fighting time right now.

"THE COURT: You are pretty much what?

"THE DEFENDANT: I'm fighting time right now. This was an unwanted pregnancy.

"THE COURT: I understand that, but it happened.

"THE DEFENDANT: Right. Right. And I have talked to the doctors, and I have talked to the social workers, and if I am released, I will be trying to have a procedure done.

"THE COURT:   But if that doesn't happen, if you are sentenced to an institution, or if you [are] placed on a term of probation, and it's too late for you to have an abortion, what I am asking you is this: What are your plans in that regard?

"THE DEFENDANT:  It would be in the state of Ohio.

"THE COURT:  Would you be placing the child up for adoption here in this state or would you be trying to keep your child?

"THE DEFENDANT:  I would be giving it up for adoption.

"THE COURT:   All right.   What I am going to do at this time, I'm sentencing you to the Ohio State Reformatory for Women at Marysville for six months, credit for time served, and costs are imposed in this case.

"*If you want to tell me that you would like to serve a term of probation up here in Cuyahoga County and that you have got someplace to stay, and you can sign up for Welfare and receive Medicare and place your child, if you would rather work that out, I'll consider that as well.*

"So why don't you discuss that with your lawyer and let me know what you want to do.  You can go in the lockup.

"MR. VEGH:  Your Honor, I want to understand what you are suggesting.

"THE COURT:  *I'm saying that she is not having a second term abortion.*

"MR. VEGH:  You are making that contingent upon—

"THE COURT:   It's not contingent upon anything.   It's based on all the factors before me as far as releasing her and as far as security.

"MR. VEGH:  Your Honor, I don't think that's a valid term of—

"THE COURT:  You are not in a position to criticize me.

"MR. VEGH:  I'm not criticizing the Court.  I'm objecting.

"THE COURT:  Which has no bearing on this case.

"So go talk to your client or I'll assign another counsel.

"MR. VEGH:  I would like another counsel.

"THE COURT:  You are removed from representation." (Emphasis added.)

4

{¶ 5} After removing Vegh as counsel of record, Cleary summoned attorney Robert Steely, who was in the courtroom for a different matter, to step forward and represent Kawaguchi. Based on what had just transpired, both Vegh and Steely understood Cleary to be offering a sentencing "quid pro quo." That is, if Kawaguchi agreed to have her baby, Cleary would sentence her to probation; if, however, Kawaguchi insisted on pursuing an abortion, Cleary would sentence her to a six-month prison term. Steely confirmed his understanding of Judge Cleary's intent during off-the-record discussions with her. According to Steely, Cleary told him that she "cannot condone an abortion." Steely memorialized his understanding of the events at Kawaguchi's sentencing in a memorandum he prepared for his file about two days after the sentencing hearing.

{¶ 6} The events of Kawaguchi's sentencing hearing came to the attention of attorneys with the Ohio chapter of the American Civil Liberties Union. Kawaguchi met with ACLU attorneys and agreed to have them represent her in efforts to secure her release from incarceration. On October 9, 1998, ACLU lawyers filed a motion in Cuyahoga County Common Pleas Court to stay execution of Kawaguchi's sentence so that Kawaguchi could be released from custody pending an appeal of her sentence. As the judge assigned to Kawaguchi's case, Cleary would have ordinarily heard the motion. See Loc.R. 15(B) of the Court of Common Pleas of Cuyahoga County, General Division. Cleary, however, was not in the courthouse on October 9, 1998, and the matter was therefore heard by Judge Lillian J. Greene, who was the acting administrative judge on that day.

{¶ 7} Before hearing the motion, Judge Greene asked Assistant Prosecuting Attorney William Caine to contact Cleary's chambers and confirm Cleary's unavailability. Caine telephoned Cleary's bailiff, Margaret Mazzeo, and asked whether Cleary was available for "a matter of some urgency." Mazzeo informed Caine that Cleary was unavailable that day and could not be reached. Judge Greene then proceeded with a hearing on Kawaguchi's motion. After hearing the

arguments of counsel, Judge Greene granted Kawaguchi's motion and journalized an entry setting appellate bond in the amount of $15,000.

{¶ 8} On the afternoon of October 9, 1998, Mazzeo learned of Judge Greene's order and contacted Cleary by telephone. Cleary instructed Mazzeo to draft an order revoking Judge Greene's entry and to sign Cleary's name to it. Cleary had never before asked Mazzeo (or anyone else) to sign Cleary's name to any order. Mazzeo followed Cleary's instructions and filed an entry revoking the bond that Judge Greene had previously granted. The entry also set a new bond hearing for October 13, 1998.

{¶ 9} The bond hearing specified in Cleary's entry never took place. Before the scheduled hearing time, Cleary filed an entry denying Kawaguchi's motion for bond pending appeal. The entry stated that her decision was "based upon presentence report information indicating defendant is at risk of fleeing." In fact, the PSI contained no such information and instead suggested that Kawaguchi was a "good candidate" for probation. Kawaguchi immediately petitioned the Eighth District Court of Appeals for an order granting bond pending appeal. The court of appeals granted this motion and Kawaguchi was released from jail on the afternoon of October 13, 1998. Kawaguchi looked into obtaining an abortion in the days following her release, only to learn that her pregnancy was too far advanced for legal abortion in Ohio. Kawaguchi ultimately gave birth to a daughter in February 1999.

{¶ 10} In January 1999, while Kawaguchi's appeal of her sentence was pending, Cleary accepted an invitation to speak in front of the congregation at the Church on the Rise in Westlake. Cleary devoted much of the speech to discussing the Kawaguchi case and her sentencing decision. Many of the details she revealed were misleading. For example, Cleary told her audience that she "could have given [Kawaguchi] a few more years' time if I had seen fit," when, in fact, the maximum prison sentence she could have imposed for Kawaguchi's fifth-degree felony was

twelve months. See R.C. 2929.14(A)(5). She also told the congregation that, following the sentencing hearing, Vegh "immediately went to the *Plain Dealer* reporter * * * who I'm not on the best of terms with" even though she later admitted having no knowledge that Vegh had done so. At yet another point in the speech, Cleary inaccurately blamed the ACLU attorneys for delaying Kawaguchi's eventual release on appellate bond:

"So, of course, they went to federal court, which was not legally appropriate. This caused a week's delay in time in having Ms. Kawaguchi released. I'm just going over this time line to let you know that God works in very interesting ways and through a variety of people, including incompetence by lawyers."

{¶ 11} While Kawaguchi's lawyers did, in fact, seek habeas corpus relief in federal court before filing their motion for bond in state court, Cleary's assertion that the federal filing caused "a week's delay" was highly misleading. Kawaguchi's attorneys filed the federal action on October 8, 1998, just one day before they filed the motion for appellate bond in state court (which Judge Greene granted). Thus, Kawaguchi could have been released just one day after her attorneys filed (properly or not) in federal court but for Cleary's later entry revoking Judge Greene's order.

{¶ 12} In addition to telling a misleading version of the events surrounding Kawaguchi's sentencing, Cleary talked at length about her struggle with Kawaguchi's case and how she prayed for God to save "just this one baby." She also denigrated the ACLU lawyers representing Kawaguchi, referring to them in derogatory terms and equating them with "evil" forces:

"Now, again, this is a 21-year old girl. She's got a couple of old harpies [2] from the ACLU that she's living with, and they're on her day in and day out. So,

---

2. A "harpy" is "a predatory monster in chiefly classical mythology represented as having a woman's head and the body and claws of a vulture and as being an instrument of divine vengeance." Webster's Third New International Dictionary (1986) 1035. The term also refers to a shrewish woman or predatory person. *Id.*

they—I know what's happening, that they're working on this girl and browbeating her into changing her mind or to steer her toward having an abortion.

"That weekend I went to church, and I was so downhearted, and I'm already in the mindset of forgiving God for not pulling through on my request to save this child, and I'm telling God that I understand that the forces of evil in this world are strong.

"And, I do believe in Satan, and I've had some of his workers in my courtroom, at least a few thoroughly evil, wicked people. So, that has reinforced not only my belief in God but my belief in Satan. I mean, that force is a real presence."

{¶ 13} On April 17, 2000, the relator, Cleveland Bar Association, filed a four-count disciplinary complaint against Cleary. Count I alleged that Cleary's behavior in sentencing Kawaguchi violated Canons 3(B)(5) (a judge shall perform duties without bias and prejudice) and 3(E)(1) (a judge shall disqualify himself or herself when the judge's impartiality might reasonably be questioned) of the Code of Judicial Conduct. In Count II, the relator alleged that Cleary violated Canon 3(B)(9) (judge shall not make any public comment on pending matter that may affect its outcome or impair its fairness) by talking publicly about the Kawaguchi case in her speech at the Church on the Rise. Count III charged violations of Canons 3(B)(4) (judge shall be patient, dignified, and courteous when performing official duties) and 3(B)(5) for Cleary's on-the-record exchange with attorney Vegh at Kawaguchi's sentencing hearing. Finally, Count IV charged Cleary with a violation of Gov.Bar R. V(4)(G) (duty to cooperate) for allegedly misleading members of the relator's grievance committee during an investigation of her conduct.

{¶ 14} A three-member panel of the board held an evidentiary hearing and, at the close of the relator's evidence, dismissed Counts II, III, and IV on Cleary's motion. The panel denied Cleary's motion to dismiss Count I, however, and also

determined, without objection, that it would consider whether the conduct alleged in that count violated DR 1-102(A)(5) (conduct prejudicial to the administration of justice). See Regulation 1(A), Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline.

{¶ 15} The panel concluded that Cleary's conduct in sentencing Kawaguchi violated Canons 3(B)(5) and 3(E)(1) as charged in Count I of relator's complaint. The panel specifically found that Cleary's sentencing of Kawaguchi "was, in part, motivated by her personal beliefs regarding abortion, which rendered her unable to objectively apply the standards which she was required to follow in sentencing her." The panel also concluded that Cleary had violated DR 1-102(A)(5) by virtue of her conduct in the aftermath of Judge Greene's order granting bond to Kawaguchi. In mitigation, the panel noted that Cleary lacked any prior record of discipline and possessed no dishonest or selfish motive. The panel acknowledged Cleary's character and reputation as mitigating evidence and also noted in mitigation that Cleary had lost her judicial position in the November 2000 election. The panel determined, however, that these mitigating factors were outweighed by the harm caused to Kawaguchi, Cleary's failure to acknowledge the wrongful nature of her conduct, and the panel's finding that Cleary "made false and deceptive statements in her testimony before this panel in an attempt to exculpate herself from responsibility for her misconduct." Accordingly, the panel recommended a six-month suspension from the practice of law.

{¶ 16} The board adopted the panel's findings of fact and conclusions of law. It recommended, however, that Cleary be suspended for two years, with one year stayed, "in light of the damage done to the justice system and the panel's finding that this judicial officer did not tell the truth under oath." Cleary objects to the board's findings and to the board's recommended sanction.

II

{¶ 17} Cleary complains that "[t]he Board's findings * * *, which consistently ignore record evidence and isolate details from their broader context, cannot satisfy the 'clear and convincing' standard." Cleary emphasizes that the sentence she imposed for Kawaguchi's crime (six months' imprisonment with credit for time served) was a legal and reasonable sentence for a fifth-degree felony. Moreover, Cleary argues that the board's theory for discipline—that she offered Kawaguchi a sentencing quid pro quo—is unsupported by the record and actually contradicted by evidence "ignored" by the board. Cleary contends that the board disregarded considerable evidence that she intended to sentence Kawaguchi to prison all along and that any mention of "probation" at the sentencing hearing meant only that she would entertain a motion for "shock probation" after Kawaguchi had served thirty days in the penitentiary.[3] Cleary also insists that the board should not have credited testimony from Vegh and Steely that they understood Cleary to be offering Kawaguchi a sentencing quid pro quo.

{¶ 18} In disciplinary proceedings, the relator bears the burden of proving by clear and convincing evidence that the respondent has committed misconduct. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus. This court has defined "clear and convincing evidence" as

---

3. As a technical matter, we note that there was no such thing as "shock probation" at the time of Kawaguchi's sentencing. "Shock probation" existed under former R.C. 2947.061 and allowed the trial court, upon a defendant's motion, to suspend further execution of a defendant's sentence and place the defendant on probation after the defendant had served a statutorily prescribed period of time. See 146 Ohio Laws, Part I, 116-117. The General Assembly repealed the shock probation statute in Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7809; shock probation is therefore not available for any offenses committed after July 1, 1996. See *State v. Coffman* (2001), 91 Ohio St.3d 125, 126, 742 N.E.2d 644, 646. A "modification" of former R.C. 2947.061 exists, however, at R.C. 2929.20, which allows a convicted defendant to file a motion for "judicial release." *State v. Perry* (Sept. 1, 2000), Hamilton App. Nos. C-000121, B-9704966, unreported, 2000 WL 1235949. Under R.C. 2929.20(B), an eligible offender may ask the trial court for release from prison after serving part of his or her prison sentence (at least thirty days if the prison term was imposed for a fourth- or fifth-degree felony). If the trial court grants the defendant's motion, it orders the defendant released and imposes a community control sanction. R.C. 2929.20(I). Although "judicial release" under R.C. 2929.20 is different from "shock probation" under former R.C. 2947.061, Cleary used these terms interchangeably.

"that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. Cleary's argument here appears to be that the panel and board should have believed her side of the story rather than the version told by the relator's witnesses. As this court has previously noted, however, "it is of no consequence that the board's findings of fact are in contravention of the respondent's or any other witness's testimony. 'Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.' " *Disciplinary Counsel v. Zingarelli* (2000), 89 Ohio St.3d 210, 217, 729 N.E.2d 1167, 1174, quoting *Cross*, 161 Ohio St. at 478, 53 O.O. at 365, 120 N.E.2d at 123-124. While this court is not bound by the findings of fact of the board and panel, see *Reid* at paragraph one of the syllabus, we give them some deference in light of the reality that the panel observed the witnesses firsthand. See *Zingarelli*, 89 Ohio St.3d at 218, 729 N.E.2d at 1174. Although we will disregard the panel's findings when the record weighs heavily against them, see *Findlay/Hancock Cty. Bar Assn. v. Filkins* (2000), 90 Ohio St.3d 1, 734 N.E.2d 764, this is not such a case.

{¶ 19} Despite Cleary's arguments to the contrary, the sentencing hearing transcript supports the panel's finding that Cleary offered an improper sentencing quid pro quo based on her moral opposition to abortion. Cleary expressly stated on the record that probation was a possibility if Kawaguchi chose to place the baby for adoption. Nowhere in the sentencing transcript, however, does Cleary give any other alternative for avoiding prison time. And Cleary, when asked by Vegh for an explanation of the sentencing options, stated bluntly, "I'm saying that she is not having a second term abortion." Although Cleary testified that she meant by this

comment only to emphasize that Kawaguchi would be going to prison, and therefore not have the opportunity to obtain an abortion, the statement strongly connotes a sentencing quid pro quo, particularly when considered in the context in which she said it.

{¶ 20} Steely's testimony about his off-the-record discussions with Cleary following the sentencing hearing provides further evidence that Cleary meant exactly what she said at the sentencing hearing: that Kawaguchi could receive probation if she chose to have her baby but would go to prison if she wanted to obtain an abortion. In one of these conversations, Cleary confirmed Steely's understanding of Kawaguchi's sentencing options when "the Judge reiterated to me that the young lady, if she insisted on having an abortion, was going to prison, and if she would give the child up for adoption, probation was available." Steely also testified that, in a separate conversation, Cleary told him that, because of her background, she "cannot condone an abortion."

{¶ 21} Cleary makes much of the fact that the panel gave considerable weight to Vegh's and Steely's hearing testimony, while ignoring Steely's "contemporaneous" memorandum dictated two days after the sentencing hearing. Cleary complains that Steely's memorandum contains no reference to any off-the-record statement about a quid pro quo. Because of this inconsistency, Cleary claims that any reliance on Steely's testimony is inherently suspect. We are unpersuaded by Cleary's assertion because we see no logical inconsistency between Steely's memorandum and his testimony. Steely testified at the hearing that Judge Cleary told him off the record that if Kawaguchi "insisted on having an abortion, [she] was going to go to prison, and if she would give the child up for adoptions [*sic*], probation was available." In his memorandum, Steely stated, "I explained to Yuriko that the Judge had indicated that if she would agree to carry the child and put it up for adoption, the Judge would put her on probation, the probation could be here or in California, and she would not have to go to prison." While the

memorandum does not explicitly refer to an off-the-record discussion with Cleary, the panel may have quite reasonably concluded that it implicitly did so. Thus, we find no merit to Cleary's assertion that the panel gave undue weight to Steely's testimony.

{¶ 22} The panel had further basis for rejecting Cleary's explanation that she was inviting Kawaguchi to file a motion for "shock probation" during her prison term and not offering a quid pro quo. Nowhere in the record does the phrase "shock probation" appear, despite the fact that Cleary, an experienced common pleas judge, was well aware of the difference between so-called "shock probation" and ordinary probation (*i.e.*, community control sanctions). And neither Vegh nor Steely, both of whom are experienced in criminal practice, understood Cleary to be referring to shock probation. Steely testified that Cleary made no specific reference to "shock probation" until an off-the-record discussion that took place only after Cleary had imposed the prison sentence. Moreover, Cleary's own bailiff, Mazzeo, did not corroborate her explanation. Mazzeo testified that she usually recorded a notation in her file whenever Cleary instructed defense counsel that she would consider a motion for shock probation. She made no such notation relating to Kawaguchi's sentencing.

{¶ 23} Cleary also emphasizes one line of the sentencing hearing transcript, in which she told Kawaguchi, "I'm trying to work out my time frame if I would place you on probation." Cleary contends that her use of the phrase "time frame" can only be a reference to shock probation, fatally undermining the board's finding of a sentencing quid pro quo. We cannot conclude, however, that this one phrase renders the board's findings defective when so much of Cleary's conduct clearly and convincingly demonstrates that she did, in fact, offer Kawaguchi a sentencing quid pro quo. The mention of a "time frame" comes in the context of Cleary's asking Kawaguchi whether she would keep her child or place the child for adoption in Ohio. At best, it is unclear what Cleary means. But rather than indicating an

13

offer of shock probation, Cleary's statement that she is "trying to work out my time frame" is more reasonably construed as an inquiry about when she could expect Kawaguchi to give birth.

{¶ 24} In light of the evidence in the record supporting the allegation that Cleary extended a sentencing quid pro quo, we reject Cleary's claim that the board's findings are not supported by clear and convincing evidence. We accordingly adopt the board's findings of fact.

### III

{¶ 25} Cleary argues that, even if she was motivated by her moral opposition to abortion in sentencing Kawaguchi, the board's conclusion that she committed misconduct as alleged in Count I is still incorrect. Specifically, Cleary contends that (1) the board has not shown "bias or prejudice" within the meaning of Canon 3(B)(5), (2) she was not required to disqualify herself under Canon 3(E)(1), and (3) she did not engage in any conduct "prejudicial to the administration of justice" within the meaning of DR 1-102(A)(5). We find no merit to Cleary's arguments.

*Canon 3(B)(5)*

{¶ 26} Canon 3(B)(5) of the Code of Judicial Conduct provides:

"A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, gender, religion, national origin, disability, age, sexual orientation, or socioeconomic status, and shall not permit staff, court officials, and others subject to the judge's direction and control to do so."

{¶ 27} The term "bias or prejudice," when used in reference to a judge, "implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind

which will be governed by the law and the facts." *State ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph four of the syllabus; see, also, *In re Disqualification of Cleary* (2000), 88 Ohio St.3d 1220, 1222-1223, 723 N.E.2d 1106, 1108. That a judge has a general opinion about a legal or social matter relating to a pending case does not automatically render a judge biased or prejudiced within the meaning of the judicial canons. Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3 Ed.2000) 113, Section 4.04. A judge is free to hold his or her own personal beliefs, so long as those attitudes, prejudices, or beliefs are not translated into action or inaction that results in a violation of the Code of Judicial Conduct or of law. *In re Inquiry Concerning a Judge* (Fla.1978), 357 So.2d 172, 177-178.

{¶ 28} We agree with the board that Cleary violated Canon 3(B)(5) by offering Kawaguchi an improper sentencing quid pro quo. Cleary's statements at the sentencing hearing about granting probation displayed partiality toward certain conduct that Cleary thought morally appropriate. Cleary made clear that Kawaguchi would not receive probation if she intended to terminate her pregnancy, a possibility that Kawaguchi revealed during the sentencing hearing and in a previous letter to Cleary. Thus, Cleary exhibited partiality in her sentencing choice based on whether Kawaguchi acted in accordance with Cleary's personal views. Such display of partiality toward certain conduct injected a bias and prejudice in Kawaguchi's sentencing proceeding that should not be tolerated. Cf. *Pa. Supreme Court Judicial Inquiry & Review Bd. v. Fink* (1987), 516 Pa. 208, 228-231, 532 A.2d 358, 368-369 (imposing discipline on a judge for favoring parties based on their statements of religious belief, creating an appearance of religiously biased treatment in court).

{¶ 29} Cleary presents a number of arguments in support of her claim that her conduct in sentencing Kawaguchi cannot be bias or prejudice warranting discipline under the Code of Judicial Conduct. Cleary first emphasizes that

Kawaguchi's six-month prison sentence was appropriate based on factors in the record and was therefore an appropriate exercise of judicial discretion. But the fact that Kawaguchi's prison sentence fell within the statutory range for fifth-degree felonies and is objectively reasonable in relation to the facts of Kawaguchi's case does not automatically legitimize Cleary's conduct.[4] See, *e.g.*, *In re Graham* (Fla.1993), 620 So.2d 1273, 1275 (although sentence imposed was within legal range, the judge's conduct in imposing it was improper when the record showed that judge was motivated by his own perception that defendant took advantage of political favoritism in the sheriff's office); *In re King* (1991), 409 Mass. 590, 601-602, 568 N.E.2d 588, 594 (even though bail decisions are within trial court's discretion, discipline was warranted when judge set high bail for four black defendants as retaliation for black voters' having overwhelmingly rejected judge's brother in a gubernatorial primary election). Even if we accept the notion that a six-month sentence was an appropriate punishment for Kawaguchi's crime, Cleary remains subject to discipline for offering an inappropriate sentencing quid pro quo to Kawaguchi.

{¶ 30} Cleary next argues that she cannot be disciplined for being biased or prejudiced because there has been no showing that any bias or prejudice she harbored was "extrajudicial." Under this so-called "extrajudicial source" doctrine, the only "bias" recognized as improper is that which stems from a source outside the judicial proceedings giving rise to the claim of bias. *Liteky v. United States* (1994), 510 U.S. 540, 550-551, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474, 487-488; see, also, *United States v. Grinnell Corp.* (1966), 384 U.S. 563, 583, 86 S.Ct. 1698,

---

4. The sentence Cleary handed down was not "legal" in the true sense. The Eighth District Court of Appeals, in a split decision, vacated the sentence and remanded for resentencing, finding that Cleary had not followed relevant sections of the felony sentencing statutes. *State v. Kawaguchi* (2000), 137 Ohio App.3d 597, 739 N.E.2d 392. Specifically, the court of appeals found that "the trial court committed reversible error when it failed to meet the statutory mandate of R.C. 2929.19(B)(2)(a) by providing a finding that gives its reasons for the imposition of a term of incarceration for a felony of the fifth degree." *Id.* at 609, 739 N.E.2d at 400.

1710, 16 L.Ed.2d 778, 793. Cleary's extrajudicial source argument is also meritless. The allegations of bias in this case are premised upon Cleary's improper extension of a sentencing quid pro quo, which was based on her personal moral stand against abortion. A trial ruling, such as the sentencing decision in Kawaguchi's case, may be considered to be the product of judicial bias if based on improper extrajudicial motives or if "it is so extreme as to display clear inability to render fair judgment." *Liteky*, 510 U.S. at 545, 551, 114 S.Ct. at 1152, 1155, 127 L.Ed.2d at 484-485, 488.

{¶ 31} Cleary also invokes this court's decision in *State v. Arnett* (2000), 88 Ohio St.3d 208, 724 N.E.2d 793, as support for the proposition that her sentencing decision is unworthy of discipline. In *Arnett*, this court decided whether a trial judge's reference to Biblical text rendered a criminal defendant's sentence improper. The trial judge in *Arnett* stated during the defendant's sentencing hearing that she had consulted a passage from the Book of Matthew in helping her decide the appropriate sentence for pandering obscenity and multiple counts of child rape. This court did not find that the trial judge's reference to the Bible warranted reversal of the defendant's sentence. We held that the judge's reference to the Bible "constituted a permissible exercise of her discretion" because the judge merely used the Biblical passage to guide her on how much weight she accorded to a statutory sentencing factor, *i.e.*, the age of the victim. *Id.* at 216, 724 N.E.2d at 800; see, also, R.C. 2929.12(B)(1). We also found no due process violation in the trial judge's consideration of the Bible in her sentencing decision because the record failed to show that the judge's personal religious principles were the primary basis for the sentencing decision. 88 Ohio St.3d at 221-222, 724 N.E.2d at 803-804. Rather, "[t]he Bible was but one factor, among many, that supported this judge's legally unremarkable decision to assign significant weight to the seriousness of Arnett's offenses against young victims." *Id.* at 221-222, 724 N.E.2d at 804.

**{¶ 32}** Cleary equates her conduct with that of the trial judge in *Arnett*, contending, "Consistent with the law (which did not require otherwise) and her personal beliefs, Cleary did not take Kawaguchi's desire for an abortion into account as an overriding mitigating factor." She therefore argues that her decision should be "treated no differently" than the *Arnett* judge's decision.

**{¶ 33}** Cleary's reliance on *Arnett* is misplaced for a number of reasons. First, Cleary's method of framing the issue misses the point. We are not sanctioning Cleary for failing to consider Kawaguchi's desire for an abortion a "mitigating factor"; rather, we are imposing discipline for Cleary's improper extension of a sentencing quid pro quo, which conditioned the possibility of probation on Kawaguchi choosing to have her child rather than obtain an abortion. If Cleary had, in good faith, concluded from her judicial deliberations that prison was an appropriate sentence, then Canon 3(B)(5) would not have been implicated by her decision to sentence Kawaguchi to a prison term. But Cleary's offer of probation as an inducement for Kawaguchi to give birth reflected a partiality toward persons choosing to act in accordance with Cleary's personal beliefs regarding abortion. Moreover, Cleary's method of framing the issue, *i.e.*, in terms of whether she was required to treat Kawaguchi's desire for an abortion as a "mitigating factor," finds no support in the record. There was no mention at the sentencing hearing of either Kawaguchi's pregnancy or desire for an abortion *until Cleary herself* brought up the subject. The events of the sentencing hearing belie any claim that Kawaguchi or her counsel tried to use Kawaguchi's desire to obtain an abortion as a mitigating factor in sentencing.

**{¶ 34}** Apart from Cleary's inaccurate characterization of the issue, her reliance on *Arnett* is further misplaced because *Arnett* is not the dispositive force she claims it to be. For one thing, *Arnett* was not a disciplinary matter and did not decide whether a judge's use of personal beliefs in sentencing a defendant could constitute bias or prejudice under the Code of Judicial Conduct. And although we

cited Canon 3(B)(5) as a "cautionary reminder" to courts, we did not imply the presence or absence of a disciplinary violation in that case. *Arnett*, 88 Ohio St.3d at 222, 724 N.E.2d at 804. For another thing, *Arnett* is readily distinguishable as a matter of substantive law. In *Arnett*, the trial judge was required under the felony sentencing law to consider the age of the victim as a factor in deciding the appropriate sentence. *Id.* at 214, 724 N.E.2d at 798. The judge in *Arnett* used a passage of Biblical verse to guide her in a determination of how much weight to give to this statutory factor. *Id.* at 215, 724 N.E.2d at 799. In this case, however, clear and convincing evidence establishes that Cleary used a nonstatutory sentencing factor—her antiabortion beliefs—as a reason for offering Kawaguchi a sentencing quid pro quo. The *only option* Cleary gave Kawaguchi to avoid prison was an agreement to have the child rather than obtain an abortion, exhibiting Cleary's inclination to alter the sentence she would otherwise give based on her antiabortion bias.

{¶ 35} We accordingly adopt the board's finding that Cleary's conduct in sentencing Kawaguchi violated Canon 3(B)(5).

*Canon 3(E)(1)*

{¶ 36} Cleary also objects to the board's conclusion that she violated Canon 3(E)(1), which states that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Cleary contends that her personal antiabortion beliefs do not provide a sufficient basis upon which to question her impartiality in presiding over Kawaguchi's case. See, *e.g.*, *United States v. Norton* (C.A.6, 1983), 700 F.2d 1072, 1076 (judge's general statements reflecting prevailing societal attitudes did not require disqualification). We reject Cleary's contention, however, because we are convinced that Cleary should have at least disqualified herself from ruling upon Kawaguchi's postsentencing motion for bond.

**{¶ 37}** The episode at the sentencing hearing, in which Cleary offered probation if Kawaguchi had her baby, gave the appearance that Cleary had sentenced Kawaguchi to prison to prevent her from having an abortion. Indeed, this was how Attorney Steely, a disinterested observer until Cleary summoned him forward to replace Attorney Vegh, interpreted Cleary's behavior during Kawaguchi's sentencing. "A judge's mode of articulating a basis for decision may exhibit such a degree of antagonism or other offensive conduct that a single incident would indicate that impartial judgment is not reasonably possible." *In re Hocking* (1996), 451 Mich. 1, 13, 546 N.W.2d 234, 240. Here, Cleary's conduct at sentencing raised a genuine question about her impartiality in ruling upon Kawaguchi's motion for bond.

**{¶ 38}** Cleary's behavior on the day she countermanded Judge Greene's order granting bond raised further questions about her impartiality. By all accounts, Cleary was away from the courthouse and had declared herself unavailable on the day Kawaguchi filed her motion for bond pending appeal. Yet Cleary, in an action she admits was unprecedented during her tenure on the bench, instructed Mazzeo by telephone to prepare an order countermanding Judge Greene's order and to sign Cleary's name to it. By acting in this admittedly extraordinary manner, Cleary appeared to give Kawaguchi's case special scrutiny, motivated by a personal desire to prevent Kawaguchi from obtaining an abortion upon being released on bond.

**{¶ 39}** Cleary justifies her action by emphasizing that the assistant prosecutor who inquired as to her availability on the day of the bond motion did not specifically mention the Kawaguchi matter. She further notes that she specifically instructed Mazzeo to keep her apprised of anything happening in the Kawaguchi case. But these purported justifications actually support the board's conclusion that Cleary violated Canon 3(E)(1). By insisting that she was available to deny Kawaguchi's motion for appellate bond when she was otherwise unavailable for

any other matters that may have come before her that day, Cleary brought her impartiality into question.

{¶ 40} We therefore adopt the board's finding that Cleary violated Canon 3(E)(1).

*DR 1-102(A)(5)*

{¶ 41} Cleary challenges the board's finding that she violated DR 1-102(A)(5) by her actions following Judge Greene's order granting Kawaguchi's motion for appellate bond. Cleary notes that this court has not precisely defined "conduct prejudicial to the administration of justice." She contends, however, that this court has generally limited DR 1-102(A)(5) "to truly extraordinary conduct that violates clear, well-established statutes or rules and directly impedes a court proceeding." Cleary argues that none of her acts following Judge Greene's order qualifies under this standard. We reject Cleary's arguments and adopt the board's findings.

{¶ 42} Cleary errs in saying that we have limited DR 1-102(A)(5) to extraordinary illegal conduct. In two cases, for example, this court found that judges violated DR 1-102(A)(5) for conduct that was improper but not necessarily of the venal, dishonest, or illegal nature focused on by Cleary. See *Disciplinary Counsel v. Ferreri* (2000), 88 Ohio St.3d 456, 727 N.E.2d 908 (judge violated DR 1-102[A][5] by making improper *ex parte* contact); *Disciplinary Counsel v. Mestemaker* (1997), 78 Ohio St.3d 92, 676 N.E.2d 870 (judge violated DR 1-102[A][5] by making derogatory remarks based on litigant's national origin and by other instances of poor judicial temperament). We therefore reject any claim that we should limit our application of DR 1-102(A)(5) as Cleary suggests.

{¶ 43} Cleary correctly asserts that this court has not precisely defined "conduct prejudicial to the administration of justice" for purposes of DR 1-102(A)(5). As the Supreme Court of Minnesota has observed, however, DR 1-102(A)(5) is sufficiently well defined because it "do[es] no more than reflect the

fundamental principle of professional responsibility that an attorney * * * has a duty to deal fairly with the court and the client." *In re Charges of Unprofessional Conduct Against N.P.* (Minn.1985), 361 N.W.2d 386, 395; see, also, *State v. Nelson* (1972), 210 Kan. 637, 640, 504 P.2d 211, 214 ("It cannot be seriously contended that 'prejudicial' does not sufficiently define the degree of conduct which is expected of an attorney"). As applied to our judiciary, we find it beyond dispute that a judge has a similar duty under DR 1-102(A)(5) to deal fairly with attorneys and litigants who come before the court. Accordingly, we hold that a judge acts in a manner "prejudicial to the administration of justice" within the meaning of DR 1-102(A)(5) when the judge engages in conduct that would appear to an objective observer to be unjudicial and prejudicial to the public esteem for the judicial office. See *Broadman v. Comm. on Judicial Performance* (1998), 18 Cal.4th 1079, 1092, 77 Cal.Rptr.2d 408, 415, 959 P.2d 715, 722; *In re Kelly* (1987), 225 Neb. 583, 591, 407 N.W.2d 182, 187; *In re Wright* (1985), 313 N.C. 495, 329 S.E.2d 668.

{¶ 44} Against this standard, Cleary's conduct following Judge Greene's order granting Kawaguchi bond pending appeal violates DR 1-102(A)(5). By her own admission, Cleary took extraordinary action to countermand an entry of the acting administrative judge, despite having declared herself to be otherwise unavailable for judicial duty. To an objective observer, Cleary appeared to go out of her way to hamper Kawaguchi's efforts to obtain legal relief, in the form of an appellate bond, which may have allowed Kawaguchi to terminate her pregnancy. Moreover, even though the board did not find expressly that Cleary's extension of a sentencing quid pro quo itself violated DR 1-102(A)(5), we find that Cleary's conduct in that respect also constituted conduct prejudicial to the administration of justice. Cleary's behavior at the sentencing hearing, particularly when viewed in conjunction with her comments in her Church on the Rise speech, exhibited a bias unrelated to the merits of Kawaguchi's case and was therefore damaging to the integrity of the judiciary.

**{¶ 45}** We accordingly adopt the conclusion of the board that Cleary's actions violated DR 1-102(A)(5).

IV

**{¶ 46}** For the reasons set forth above, we adopt the board's findings of fact and conclusions of law. We also adopt the board's findings in aggravation and mitigation. We depart, however, from the board's recommendation of the appropriate sanction for Cleary's conduct. Even though the panel deemed a six-month suspension appropriate, the board recommended that Cleary be suspended from the practice of law for two years, with one year stayed. We consider the board's recommendation unduly harsh and instead adopt the sanction recommended by the panel.

**{¶ 47}** We find Cleary's conduct comparable to that of the respondent in *Disciplinary Counsel v. Hoague* (2000), 88 Ohio St.3d 321, 725 N.E.2d 1108. In *Hoague*, we imposed a six-month suspension, with the entire six months stayed, against a municipal court judge who "misused the authority of his judicial office in an attempt to achieve his personal goal of reprimanding persons he believed were guilty of reckless driving." *Id.* at 323, 725 N.E.2d at 1110. Similarly, in this case, it is apparent from the record that Cleary misused her judicial office in an attempt to achieve her personal goal of ensuring that Kawaguchi did not obtain an abortion. Accordingly, as in *Hoague*, we find a six-month suspension from the practice of law to be the appropriate sanction. Unlike in *Hoague*, however, we decline to stay any part of Cleary's suspension in light of the board's finding that Cleary made false and deceptive statements to the panel in an attempt to exculpate herself.

**{¶ 48}** Cleary is hereby suspended from the practice of law for six months. Costs are taxed to the respondent.

*Judgment accordingly.*

MOYER, C.J., RESNICK and PFEIFER, JJ., concur.

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., dissent.

_____

**FRANCIS E. SWEENEY, SR., J., dissenting.**

{¶ 49} Respectfully, I dissent. This disciplinary action stems from respondent's handling of the sentencing and postsentencing activities involved in the Kawaguchi criminal proceedings. The board found that during these proceedings, respondent offered defendant Kawaguchi an improper sentencing quid pro quo—prison if she sought an abortion, probation if she did not have an abortion. Based in large part upon this finding, the majority concludes that respondent has violated Canon 3(B)(5) (by acting with bias or prejudice), Canon 3(E)(1) (by not disqualifying herself where her impartiality could reasonably be questioned), and DR 1-102(A)(5) (by acting in a manner prejudicial to the administration of justice).

{¶ 50} Contrary to the majority, I do not believe the relator has proven that there was a sentencing quid pro quo or that respondent's personal beliefs caused her to be biased or partial in overseeing the Kawaguchi proceedings. Even though I would find that respondent has violated one of the three charges, namely DR 1-102(A)(5), in my opinion, the facts of this case do not warrant a six-month suspension. Instead, I believe the more appropriate sanction would be a public reprimand.

{¶ 51} It is fundamental that in disciplinary proceedings, the relator must prove the facts necessary to establish an ethical violation by clear and convincing evidence. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus. Under this stringent standard, the relator must produce sufficient evidence to establish in the mind of the trier of fact a "firm belief or conviction of the facts sought to be established." *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus. I do not believe the relator has satisfied this burden with respect to proving a violation of Canon 3(B)(5) or 3(E)(1).

{¶ 52} Canon 3(B)(5) provides that a judge shall perform judicial duties without bias or prejudice. The panel found that respondent violated this Canon because her sentencing of Kawaguchi "was, in part, motivated by her personal beliefs regarding abortion, which rendered her unable to objectively apply the standards which she was required to follow in sentencing her." The majority agreed with this conclusion, finding that respondent's antiabortion beliefs caused her to offer Kawaguchi an improper sentencing quid pro quo. However, in my opinion, the record is insufficient to provide clear and convincing evidence to support this finding or the conclusion that respondent's bias against abortion caused her to impose an unfair sentence on Kawaguchi.

{¶ 53} With respect to the issue of whether respondent offered Kawaguchi a sentencing quid pro quo, respondent has been adamant in her position that she never intended to offer Kawaguchi immediate probation in exchange for her assurance that she would not seek an abortion. While conceding that she could have done a better job with the terminology she used at the sentencing hearing, respondent insists that she always intended to impose a custodial sentence on Kawaguchi. Even at the sentencing hearing, respondent stated emphatically that the sentence she was imposing was not contingent upon anything but was based on all the factors before her, including her perception of Kawaguchi as a flight risk.

{¶ 54} Nevertheless, in upholding the board's finding of a sentencing quid pro quo, the majority rejects this explanation and instead relies on certain testimony, while ignoring other vital portions of the sentencing transcript and record. When the entire record is read, it becomes evident to me that the words used by respondent are subject to varying interpretations and that the explanations given by respondent are reasonable.

{¶ 55} The sentencing transcript itself is replete with ambiguities. In several instances, respondent said things that could be easily interpreted in her favor. For instance, the parties dispute what respondent meant when she told

Kawaguchi at the sentencing hearing, "I'm trying to work out my time frame if I would place you on probation." Respondent explained that when she made this remark, she was trying to work out dates in her mind to determine whether she could grant Kawaguchi shock probation so that her child would not have to be born in the penitentiary. Although respondent did not use the word "shock" when she referred to probation, she testified that this was her intent. Kawaguchi's attorney, Anthony Vegh, testified that he did not understand what respondent meant by this remark. The majority also acknowledges that "it is unclear what Cleary means" by this statement. Nevertheless, the majority somehow concludes that "rather than indicating an offer of shock probation, Cleary's statement that she is 'trying to work out my time frame' is more reasonably construed as an inquiry about when she could expect Kawaguchi to give birth." The majority's conclusion on this point is weak and is based on evidence that is certainly not sufficient to satisfy the clear and convincing standard.

{¶ 56} Another ambiguous remark the majority relies on as further proof of a sentencing quid quo pro is respondent's statement "I'm saying that she is not having a second term abortion." When read in context, this remark, albeit a blunt one, could very well be interpreted to mean what respondent suggests—that she was not going to reduce the sentence simply because Kawaguchi was pregnant.

{¶ 57} The majority also places great weight on the testimony of attorney Robert Steely to support its quid-pro-quo theory and as proof of respondent's bias and partiality. Steely testified before the panel that he had an off-the-record discussion with respondent in which she offered Kawaguchi a sentencing quid pro quo. However, this testimony, which was given twenty-six months after the sentencing hearing, is called into question by Steely's own memorandum written two days after the hearing. Although this memorandum refers to a possible sentencing quid pro quo, it merely reflects Steely's subjective understanding of what respondent meant at the sentencing hearing, rather than what respondent

expressly stated. The memorandum contains no explicit reference to an off-the-record offer of a sentencing quid pro quo. To the contrary, the memorandum is consistent with respondent's position that she was simply proposing shock probation. According to the memorandum, when Kawaguchi was in lockup, Steely was told that the original sentence would stand but that shock probation would be granted if Steely filed a motion.

{¶ 58} The majority acknowledges that the memorandum does not explicitly refer to any off-the-record discussion. Nevertheless, the majority concludes that "the panel may have quite reasonably concluded that it implicitly did so." This conclusion is a weak one and is simply not supported by the memorandum itself.

{¶ 59} Thus, based on the entire record, I do not believe that there was proof by clear and convincing evidence of a sentencing quid pro quo. Therefore, I would also disagree with the majority's conclusion that respondent was biased in sentencing Kawaguchi. The parties stipulated that the sentence imposed was within the bounds of law. In fact, respondent sentenced Kawaguchi to the minimum six-month term of imprisonment, whereas her accomplices were sentenced to six years in prison. Thus, the sentence itself was fundamentally fair.

{¶ 60} Although the remarks made by respondent may be considered intemperate, in my opinion there is no showing that the fairness of the proceeding was undermined by respondent's personal beliefs. Although respondent may have been emotional during the sentencing of Kawaguchi, I do not believe that her reaction proves that the sentence she imposed was based in part on her being biased or prejudiced. As stated by one court, "the mere fact a judge has an emotional reaction does not demonstrate that the judge is biased or prejudiced." *Cook v. Indiana* (Ind.App.1993), 612 N.E.2d 1085, 1088 (trial judge who cried during sentencing hearing found not to be biased).

{¶ 61} Furthermore, contrary to the majority, I believe that *State v. Arnett* (2000), 88 Ohio St.3d 208, 724 N.E.2d 793, supports respondent's position. Although the *Arnett* decision was not a disciplinary action, its rationale is persuasive in this case. In *Arnett*, we held that the judge's reference to the Bible did not add an impermissible factor to her sentencing decision. *Id.* at 215, 724 N.E.2d at 799. Likewise, in this case, I do not believe that respondent's antiabortion statements showed that she was motivated to impose the six-month sentence on Kawaguchi. Consequently, for all the above reasons, I would not find a violation of Canon 3(B)(5).

{¶ 62} Nor would I find that relator has proven by clear and convincing evidence that respondent has violated Canon 3(E)(1), requiring judicial disqualification when impartiality might reasonably be questioned. The majority believes that because of her antiabortion beliefs, respondent should have disqualified herself from ruling upon the postsentencing motion for bond. However, the fact that respondent countermanded an order made in a case she was assigned to is not tantamount to her acting with bias or prejudice. It was well within respondent's authority to countermand an order made in her absence in connection with a case assigned to her docket. See Cuyahoga C.P. Loc.R. 15(B), which states: "It shall be the duty of the assigned judge to handle all court activity, including motions, emergency matters, case management conferences, pretrials, trials, and any post trial matters associated with the cases assigned to the docket." Since I do not believe that respondent acted improperly or with partiality in this regard, I would reject the board's finding that respondent violated Canon 3(E)(1).

{¶ 63} However, since respondent's overall conduct could appear to an objective observer to be unjudicial, I would uphold the DR 1-102(A)(5) violation. Nevertheless, I believe that the appropriate sanction for this type of violation is a public reprimand.

DOUGLAS and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

————————————

*Thomas P. Meaney, Jr.* and *Burt J. Fulton*, for relator.

*Jones, Day, Reavis & Pogue*, *Robert C. Weber, Robert P. Ducatman, Geoffrey J. Ritts, Tracy K. Stratford* and *Matthew A. Kairis*, for respondent.

*Christopher A. Ferrara*, in support of respondent, for *amicus curiae* American Catholic Lawyers Association, Inc.

————————————