DECISION AND JUDGMENT ENTRY
{¶ 1} Cherish Lewis (hereinafter "Lewis") appeals the judgment of the Scioto County Common Pleas court designating Stephen A. Rice (hereinafter "Rice") as the residential parent of their child. On appeal, Lewis contends that the trial court judge had preconceived notions about the outcome of the case and, because of those notions, acted arbitrarily and capriciously. Lewis also contends that the court's findings regarding Munchausen Syndrome by Proxy, Parental Alienation Syndrome, and her mental health are against the manifest weight of the evidence. Finally, Lewis contends that designating Rice as the residential parent is not in the best interest of the child. Because the trial court based much of its decision on findings of fact not supported by competent and credible evidence, *Page 2 
we find merit in Lewis's appeal. Accordingly, we reverse the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.
 I. {¶ 2} Cherish Lewis gave birth to a baby girl (hereinafter "the Child") on August 8, 2004. The child was born extremely premature, with a very low birth weight, and spent the first six months of her life in an incubator. On December 6, 2004, Rice filed a complaint to determine parentage. Genetic testing determined that Rice is the father of the Child.
 {¶ 3} After leaving the hospital, the Child lived with Lewis in her family home. Also living with Lewis and the Child were Lewis's father, mother, and three sisters. Rice left the area to join the Marines sometime around the time of the Child's birth.
 {¶ 4} Based on referrals from the hospital where the Child was born, the Child received in-home therapy on a regular basis. This included physical therapy, speech therapy, and developmental therapy.
 {¶ 5} On August 29, 2005, the trial court granted parenting time for Rice while he was home on military leave. However, Lewis denied Rice visitation, claiming that Rice had not bonded with the Child or properly learned how to take care of the Child.
 {¶ 6} On January 4, 2006, the trial court permitted Regina Kelley (hereinafter "Kelley"), Rice's mother, to intervene as a party in the action.
 {¶ 7} In May 2006, the Marines discharged Rice because he failed a drug test for marijuana use. He lived in California after leaving the military. *Page 3 
 {¶ 8} On July 6, 2006, a second trial court judge (hereinafter "Judge II") was assigned to the case. The first judge had to recuse himself because he was running against Lewis's attorney in the next election.
 {¶ 9} Judge II held his first hearing on July 16, 2006. As a result of that hearing, the trial court granted Kelley regular visitation with the Child. The trial court also stated that Kelley was permitted to attend all of the Child's therapy sessions at the Lewis home.
 {¶ 10} After a September 27, 2006 hearing, the trial court found Lewis in contempt of court for denying Rice and Kelley visitation with the Child. The trial court sentenced Lewis to 30 days in jail, but she was released the next day (on September 28, 2006) when the Child was produced for visitation.
 {¶ 11} An October 20, 2006 court order stated, in relevant part, the following: (I.) that Kelley was entitled to grandparent visitation rights with the child; (II.) that Rice was entitled to long distance visitation rights with the child; (III.) that the Child's last name would be changed to Rice; (IV.) that Rice was to pay child support to Lewis; and (V.) that Lewis was to undergo counseling.
 {¶ 12} In December 2006, Rice moved from California to Tampa, Florida.
 {¶ 13} In May 2007, both Rice and Lewis filed contempt motions. Rice claimed that Lewis had defied the trial court's order by continuing to refuse him visitation rights with the Child. And Lewis claimed that Rice had failed to pay child support. Also sometime in May 2007, Rice moved to a different apartment in Tampa. *Page 4 
 {¶ 14} After a May 15, 2007 hearing, the trial court ordered that Rice would have parenting time with the child from May 16 until May 18. Rice would then be permitted to take the Child with him to Florida until August 9, 2007. Before leaving for Florida, an uninterested party from either Children's Services or Catholic Social Services was to observe Rice's interaction with the Child. Once the Child arrived in Florida, the trial court allowed Lewis reasonable phone visitation and parenting time with the Child. Additionally, the trial court made no findings regarding either party's contempt motions.
 {¶ 15} Lewis did not make the Child available for Rice on May 16, 2007. In fact, Lewis fled with the Child for a very brief period of time.
 {¶ 16} On May 18, 2007, Lewis made the Child available to Rice. Because Rice did not have the child from May 16 to May 18, the trial court allowed Rice to take the Child to Florida without the previously ordered observation from Catholic Social Services.
 {¶ 17} On June 6, 2007, Rice filed a motion to modify custody.
 {¶ 18} During an August 1, 2007 hearing, Rice testified that the Child was happy, loving, and well adjusted while living with him in Florida. He also testified that he did not continue the Child's therapy because the child was normal and healthy, and that a Tampa-area pediatrician had confirmed the Child's health. However, some of the Child's therapists testified that it was detrimental for the Child to stop receiving treatments.
 {¶ 19} Also during that hearing, the trial court found Lewis in contempt for failing to make the Child available to Rice on May 16. She was arrested after the *Page 5 
hearing and sentenced to 60 days in jail. She was released from jail on August 22, 2007.
 {¶ 20} The trial court allowed Rice to take the Child back to Florida until November 8, 2007. Additionally, the trial court suspended Rice's child support payments, ordered Lewis to undergo a psychiatric evaluation, and requested guardians at litem for the Child in both Ohio and Florida. At one point during the hearing, Judge II suggested that Lewis had Munchausen Syndrome by Proxy.
 {¶ 21} It is not entirely clear from the record, but at some time around November 2007 the court considered Rice to have temporary custody of the Child.
 {¶ 22} At a November 2, 2007 hearing, the trial court allowed Lewis parental visitation rights from that day until November 23. On November 23, Lewis and Rice were to meet halfway between Ohio and Tampa, Florida for Lewis to return the Child to Rice.
 {¶ 23} During the afternoon of November 2, 2007, Lewis noticed bruising on the Child and took the Child to the hospital. Both an investigator from Children's Services and a Deputy with the Scioto County Sheriff's Office later testified that they saw various bruises on the Child's body. The investigator from Children's Services contacted Rice and asked Rice if he would voluntarily forego his parental visitation with the Child that was to begin on November 23. Sometime later, Rice told the investigator that he was not giving up his rights as to the Child. On November 23, Lewis drove the Child to the scheduled meeting place, but Rice did not show up. *Page 6 
 {¶ 24} Sometime in January 2008, Rice moved to Lakeside, California.
 {¶ 25} At a January 4, 2008 hearing, the trial court heard evidence regarding the bruises on the Child and alleged child abuse by Rice and Kelley. Further, the trial court heard testimony that the Child was afraid of Kelley during a chance meeting at a local Wal-Mart. Also at this hearing, during the cross-examination of Lewis, Kelley's attorney asked her if she had heard of Parental Alienation Syndrome.
 {¶ 26} After hearing the evidence, the trial court refused to terminate or modify Rice's parental rights. The court also ordered the following: (I.) Kelley had grandparent visitation rights while Lewis had the Child; (II.) Lewis had to pay child support when the Child was returned to Rice; and (III.) that Lewis was to undergo psychiatric evaluation for alienation of parental affection.
 {¶ 27} Although it is not entirely clear from the record, Lewis then apparently filed an emergency motion for protective custody with the juvenile court based on the child abuse allegations. Apparently, that court granted Lewis temporary custody of the Child. But following a hearing, that court apparently denied Lewis's motion on or about February 19, 2008.
 {¶ 28} Lewis saw Licensed Professional Clinical Counselor Tracy Toward (hereinafter "Toward") on February 12, 2008. It was the first time she had seen a counselor, psychologist, or psychiatrist during the proceedings. Lewis claimed that she had a hard time finding professionals equipped to deal with Manchausen Syndrome by Proxy or Parental Alienation Syndrome. *Page 7 
 {¶ 29} Sometime between the January 4, 2008 hearing and February 20, 2008, Rice moved to Oceanside, California.
 {¶ 30} The final hearing in front of Judge II took place on February 20, 2008. At the hearing, the trial court heard testimony from Toward regarding Lewis's mental state. Toward testified that Lewis did not have either Munchausen Syndrome by Proxy or Parental Alienation Syndrome. The court also heard more testimony concerning the allegations of child abuse. Rice testified that the bruises came from an accident the Child had while fishing on a pier. A deputy with the Scioto County Sheriffs office testified that his office had an open investigation into the allegations. But the investigator from Children's Services testified that her office did not have an open investigation.
 {¶ 31} Rice testified that he lived with his fiancé in Oceanside, California; that he had enrolled the Child in a pre-school; and that the Child was happy and very well adjusted while the Child was living with him.
 {¶ 32} After meeting with the Child, Rice, Lewis, and other members of both immediate families, the guardian ad litem in Ohio testified that she could not give an opinion as to which parent should be designated the residential parent in the Child's best interest. The trial court apparently never considered the opinion of the Florida guardian ad litem.
 {¶ 33} The trial court found a change in circumstances and adopted the Plaintiff's Proposed Findings of Facts and Conclusions of Law as an order of the court. The order designated Rice as the residential parent, ordered Lewis to pay *Page 8 
child support, and set up a visitation schedule based on the school year in California.
 {¶ 34} Lewis appeals, asserting the following assignments of error: I. "The trial judge abused his discretion and ruled arbitrarily and capriciously in favor of Plaintiff/Appellee in granting him residential parentage of the parties' minor child wherein he had a pre-conceived [sic] notion as to what the outcome of the case would be prior to even hearing any evidence." II. "The trial judge imposed his own ideas on medical matters in relation to the welfare of the child and he even suggested that the Defendant/Appellant/mother had Munchousen's Syndromes [sic] and Parental Alienation Syndrome, which were both proven by Defendant/Appellant's expert witness in the matter to not exist in Defendant/Appellant, which was against what the judge's pre-conceived [sic] notion as to how the case should outcome, which is against the manifest weight of the evidence and against the outcome that he desired." And, III. "The judge ruled against the best interest of the child in not placing the child with the Defendant/Appellant/mother when it was clear in the evidence that the father refused to have the child treated pursuant to doctor's orders, refused to learn how to properly take care of the child in order to see to her developmental problems, due to the child being an extreme pre-mature [sic] baby and receiving treatment by occupational therapist, speech therapist, the case manager of MRDD, and Children Services stated that the child had been abused while in the possession of the Plaintiff/father, while on an extended visitation, when the *Page 9 
natural mother was desirous of prior to the extended visitation that the father learn how to take care of the child properly."
 II. {¶ 35} In her first assignment of error, Lewis contends that the preconceived notions of Judge II caused the trial court to rule arbitrarily and capriciously in Rice's favor. Essentially, Lewis's first assignment of error is a claim of judicial bias against Lewis and in favor of Rice.
 {¶ 36} "Judicial bias is `a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by law and the facts.'" In re Adoption ofCM.H., Hocking App. No. 07CA23, 2008-Ohio-1694, at ¶ 34, quotingState ex rel. Pratt v. Weygandt (1956), 164 Ohio St. 463, paragraph four of the syllabus. See, also, Cleveland Bar Association v. Cleary (2001),93 Ohio St.3d 191, 201; Hirzel v. Ooten, Meigs App. Nos. 06CA10, 07CA13,2008-Ohio-7006 at ¶ 62.
 {¶ 37} As noted in In re Adoption of C.M.H. and Hirzel, we have "held that such challenges of judicial prejudice and bias are not properly brought before this Court. `Rather, [A]ppellant must make such a challenge under the provisions of R.C. 2701.03, which requires an affidavit of prejudice to be filed with the Supreme Court of Ohio.'"Hirzel at ¶ 63, quoting Baker v. Ohio Dept. of Rehab. and Corr (2001),144 Ohio App.3d 740, 754. This Court does not have the *Page 10 
authority to void the judgment of a trial court because of alleged judicial bias. In re Adoption of C.M.H. at ¶ 35.
 {¶ 38} Accordingly, we overrule Lewis's first assignment of error.
 III. {¶ 39} In her second assignment of error, Lewis contends that the trial court's findings regarding Munchausen Syndrome by Proxy and Parental Alienation Syndrome were against the manifest weight of the evidence. Because of our ruling on Lewis's first assignment of error, we will not again address Lewis's claim that Judge II was biased and had a desired outcome in this case.
 {¶ 40} A trial court has broad discretion in determining parental custody rights. Booth v. Booth (1989),44 Ohio St.3d 142, 144. Therefore, a trial court's custody determination will not be disturbed unless it involves an abuse of discretion. Id. An abuse of discretion connotes that the trial court's decision was arbitrary, unreasonable, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. The trial court has discretion to do what is equitable upon the facts and circumstances of each child custody case.Booth at 144. As such, a trial court does not abuse its discretion in an award of custody and its decision will not be reversed as against the manifest weight of the evidence when it is supported by a substantial amount of competent and credible evidence. Bechtol v. Bechtol (1990),49 Ohio St.3d 21, syllabus.
 {¶ 41} We give deference to the trial court as the trier of fact because it is best able to observe the witnesses and weigh the credibility of their testimony. *Page 11 Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Finding an error in law is legitimate grounds for reversal, but a difference of opinion on the credibility of witnesses and evidence is not. Ralston v.Ralston, Marion App. No. 90830, 2009-Ohio-679, at ¶ 14, quotingDavis v. Flickinger (1997), 77 Ohio St.3d 415, 418-19. And although a trial court's discretion in a custody proceeding is broad, it is not absolute. The trial court must follow the procedure described in R.C. 3109.04. Miller v. Miller (1988), 37 Ohio St.3d 71, 74
 A. The Issue of Lewis's Mental Health {¶ 42} R.C. 3109.04(F)(1)(e) provides: "In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including * * * [t]he mental and physical health of all persons involved in the situation[.]"
 {¶ 43} Because of that, a court "may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations." R.C. 3109.04(C). Judge II ordered Lewis to undergo psychological evaluations for Munchausen Syndrome by Proxy and Parental Alienation Syndrome. The first mention of Munchausen Syndrome by Proxy came during the August 1, 2007 hearing.
 {¶ 44} THE COURT: I'm gonna order your client, counselor, Miss Lewis, to go to psychiatric evaluation and at her own expense and just get some of these problems taken care of. 8/1/07 transcript; p. 211, lines 9-12. *Page 12 
 {¶ 45} MR. MARSHALL: What kind of psychiatric evaluation? 8/1/07 transcript; p. 211, lines 13-14.
 {¶ 46} THE COURT: Well, the Court finds that she is Munchausen . . . what's the name of that? 8/1/07 transcript; p. 211, lines 15-16 (emphasis sic).
 {¶ 47} MR. MARSHALL: Munchausen Disease. 8/1/07 transcript; p. 211, line 17.
 {¶ 48} THE COURT: Yeah. I'm not a hundred percent (100%) that's not what she's experiencing. She's overly protective of her child is one thing I'm finding. 8/1/07 transcript; p. 211, lines 18-20.
 {¶ 49} During the January 4, 2008 hearing, Judge II admitted that he sua sponte suggested that Lewis had Munchausen Syndrome by Proxy.
 {¶ 50} Q: Where'd you come up with the idea of Munchausen's Syn . . . Syndrome? 1/4/08 transcript; p. 70, lines 7-8 (emphasis sic).
 {¶ 51} A: Well, that's what supposedly I had. 1/4/08 transcript; p. 70, line 9.
 {¶ 52} Q: Had or have? 1/4/08 transcript; p. 70, line 10.
 {¶ 53} A: Had. That's what they said. 1/4/08 transcript; p. 70, line 11.
 {¶ 54} MR. MARSHALL: Objection. That was suggested by the Court. 1/4/08 transcript; p. 70, lines 12-13.
 {¶ 55} THE COURT: Well, that . . . that . . . 1/4/08 transcript; p. 70, line 14 (emphasis sic).
 {¶ 56} Q: Is it, excuse me . . . 1/4/08 transcript; p. 70, line 15 (emphasis sic).
 {¶ 57} THE COURT: . . . was my suggestion. 1/4/08 transcript; p. 70, line 16 (emphasis sic). *Page 13 
 {¶ 58} MS. LEWIS: Thank you. 1/4/08 transcript; p. 70, line 17.
 {¶ 59} Q: Has anybody mentioned the term Parental Alienation Syndrome to you? 1/4/08 transcript; p. 70, lines 18-19.
 {¶ 60} A: No. 1/4/08 transcript; p. 70, line 20.
 {¶ 61} MR. BERRY: I have no further questions, your honor. 1/4/08 transcript; p. 70, lines 21-22.
 {¶ 62} Towards the end of the January 4, 2008 hearing, Judge II asked Kelley's lawyer about Parental Alienation Syndrome. It appears that Judge II had not heard of Parental Alienation Syndrome before that day's hearing.
 {¶ 63} THE COURT: There's been four (4) or five (5) things that the Court's ordered done and it hasn't been done by Miss Lewis and I'm gonna add to the things that should be done is that alienation of . . . of the other side's family. There's a Syndrome you're telling me on that? 1/4/08 transcript; p. 115, lines 3-8 (emphasis sic).
 {¶ 64} MR. BERRY: It's called Parental Alienation Syndrome, your Honor. 1/4/08 transcript; p. 115, lines 9-10.
 {¶ 65} THE COURT: Well, that needs to be looked into. 1/4/08 transcript; p. 115 lines 11-12.
 1. Munchausen Syndrome by Proxy {¶ 66} A review of the record finds no attempt to define Munchausen Syndrome by Proxy in either the Plaintiff's Proposed Findings of Fact and Conclusions of Law or the various hearings, filings, and court orders. Therefore, we recognize the following definition in the present case: "Munchausen *Page 14 
syndrome by proxy (MSBP) is a form of child abuse in which a parent (almost always the mother) consistently and chronically subjects a child to medical attention without any `true' medical condition or symptoms being present. * * * In Munchausen syndrome by proxy, the child's presenting symptoms are either falsified or directly induced by theparent." Curt R. Bartol Anne M. Bartol, Introduction to Forensic Psychology 384 (2008) (emphasis sic).
 {¶ 67} Other than stating that Lewis was "overly protective of her child," Judge II did not offer a reason for suggesting that Lewis had Munchausen Syndrome by Proxy. The Child did receive consistent medical attention for the first two years of her life, but the record contains no evidence that Lewis either falsified or induced the Child's symptoms. It is undisputed that the Child was born extremely premature. As a result, the Child spent the first six months of her life in an incubator. Many of the therapists who treated the Child testified in the various hearings, and none of them suggested that Lewis acted in a manner consistent with Munchausen Syndrome by Proxy.
 {¶ 68} The testimony of Toward, the Licensed Professional Clinical Counselor who evaluated Lewis, was the only evidence offered relating to Manchausen Syndrome by Proxy. In a session lasting approximately five hours, Toward administered a standardized personality test to Lewis and then interviewed her for 30 to 45 minutes. (Toward also attempted some projective techniques with the Child with little success.) Based on the results of her evaluation, Toward testified that Lewis does not exhibit the signs of Munchausen Syndrome by Proxy. *Page 15 
 {¶ 69} Q: I noted on Page 9 that you reviewed medical records of [the child] and found that based upon your viewing of the medical history of the child that . . . does . . . does, in fact, within a reasonable degree of clinical certainty, does Cherish Lewis exhibit signs of Munchausen's Syndrome. 2/20/08 transcript; p 13, line 24 through p 14, line 5 (emphasis sic).
 {¶ 70} A: No, she does not. Not only does she not exhibit any of the observable traits of Munchausen's Syndrome by Proxy but her entire personality profile is very much polar opposite of what . . . 2/20/08 transcript; p. 14, lines 6-9 (emphasis sic).
 {¶ 71} Q: Of Munchausen's. 2/20/08 transcript; p. 14, line 10.
 {¶ 72} A: . . . one would expect from a person with that disorder or that Syndrome as it's called. 2/20/08 transcript; p. 14, lines 11-12.
 {¶ 73} According to the Plaintiff's Proposed Findings of Fact and Conclusions of Law, the trial court "was not persuaded by [Toward's] testimony." That may be, but there is simply no affirmative evidence in the record that Lewis exhibits the signs of Munchausen Syndrome by Proxy. Rice did not produce an expert witness to counter Toward's testimony, and he offered no evidence that Lewis either falsified or caused the Child's health problems. Indeed, nowhere within the record does the trial court ever discuss the symptoms of Munchausen Syndrome by Proxy and how they might relate to Lewis.
 2. Parental Alienation Syndrome {¶ 74} As with Munchausen Syndrome by Proxy, the testimony of Toward was the only evidence offered on Parental Alienation Syndrome. "Toward stated *Page 16 
on cross-examination that there are essentially four criteria that make up Parental Alienation Syndrome; (a.) A parent limiting access and blocking contact with a child * * * (b.) False or unfounded accusations of abuse against a parent * * * (c.) Deterioration in Relationship Since Separation * * * [and] (d.) Intense Fear Reaction by Child." Plaintiffs Proposed Findings of Fact and Conclusions of Law Page 3.
 {¶ 75} Toward testified that Lewis does not have Parental Alienation Syndrome. During cross examination, Toward also testified that she did not have a degree in psychiatry or psychology; that she had a Master's Degree in Community and Agency Counseling; that she did not interview Rice or review his social history, which is part of her preferred protocol in evaluating Parental Alienation Syndrome; and that some of the factors of Parental Alienation Syndrome were present with Lewis. But Toward attributed those factors to other reasons and not Parental Alienation Syndrome. "Because those . . . because those characteristics can also be present in parental alienation for legitimate causes." 2/20/08 transcript; p. 51, lines 13-15 (emphasis sic).
 {¶ 76} The Plaintiffs Proposed Findings of Fact and Conclusions of Law mischaracterize the methods Toward used in evaluating Lewis. It says that Toward "did not follow her own protocol (e.g.: interviewing [Rice]), [but] merely reviewed the court docket, accepted [Lewis's] explanation that she only interfered with [Rice's] parenting time out of concern and simply accepted [Rice's] claim that there was some sexual or physical abuse of the child by [Rice]." Plaintiff's Proposed Findings of Fact and Conclusions of Law Page 3. However, Toward *Page 17 
testified that she administered the "the Family Social History Questionnaire and Personal History Report; the 16PF which is a standardized testing instrument that's been reliable and validated for forty-five (45) years; the Rotter Incomplete Sentence Blank which is a projective technique and several other projective techniques and self reports. There were seven (7) instruments used as well as a diagnostic interview." 2//20/08 transcript; p. 9, lines 2-9.
 {¶ 77} Based on these instruments, Toward testified that there was objective evidence that Lewis's personality does not fit the typical profile for Parental Alienation Syndrome.
 {¶ 78} A: "But the standardized testing is the crux of my evaluations and these standardized tests . . . this one in particular does have what we call in our field sort of a lie . . . a built in lie detector and it will . . . it will bring to light if a person is being . . . trying to present themselves in a more favorable light or a less favorable light for some reason and the first factor that was noted was that Miss Lewis' test was indeed valid. She scored very low on the factor where she would attempt to present herself in a more positive light. Again, I would . . . which then makes the testing valid for one thing. But then I would also refer to the fact that, as I state later in the assessment, persons with parental . . . who exhibit Parental Alienation Syndrome typically . . . and they have found this over a broad spectrum of standardized testing that they typically score high in the social desirability attempt to present self well, denial, projection, so forth. Those types of defense mechanisms and no where in Miss Lewis' testing did she . . . did she score *Page 18 
anywhere within . . . near those areas." 2/20/08 transcript; p. 15, line 14 to p. 16, line 10 (emphasis sic).
 {¶ 79} Q: So, the test is valid and you feel reasonably, medically certain . . . clinically certain that she has neither Munchausen's Syndrome nor Parental Alienation Syndrome? 2/20/08 transcript; p. 16, lines 11-14.
 {¶ 80} A: Yes. And a thorough review of my report should leave little to no question.[1] 2/20/08 transcript; p. 16, lines 15-16.
 {¶ 81} The trial court did not find Toward's testimony persuasive. See Plaintiffs Proposed Findings of Fact and Conclusions of Law Page 8. "This Court is not trained in Ms. Toward's field but this Court believes three (3) of the four (4) criteria for Parental Alienation Syndrome exist in this case and Ms. Toward's simple acceptance that Defendant has not interfered with contact, that the abuse allegations were true and that the other two criteria do not exist is simply contrary to what thiscourt's view of the facts of this case are and this Court's long judicial experience." Id. at Page 4 (emphasis added). We find the "simple acceptance" language in the Plaintiff's Proposed Findings of Fact and Conclusions of Law significant. That language inaccurately describes Toward's testimony and, therefore, distorts her methodology in evaluating Lewis. "The trier of fact is free to believe or disbelieve any witness, including an expert witness." McCabe v. Sitar, Belmont App. No. 06BE39, 2008-Ohio-3242, at ¶ 24, citing In re Baby Girl Doe,149 Ohio App.3d 717, 735, 2002-Ohio-4470, at ¶ 75. However, the following is true in the present case: (I.) the trial court's entire knowledge of *Page 19 
Parental Alienation Syndrome came from the expert it chose to disbelieve; and (II.) according to the Plaintiffs Findings of Fact and Conclusions of Law, the trial court chose to disbelieve a distorted version of Toward's findings.
 {¶ 82} The trial court took its definition of the syndrome from Toward and accepted her testimony on the subject. No psychiatrist, psychologist, or licensed counselor other than Toward evaluated Lewis. Indeed, no affirmative evidence was offered to show that Lewis has Parental Alienation Syndrome. The trial court ignored Toward's clinical opinion, including her reliance on the objective personality assessments, without hearing expert testimony to the contrary. And from a review of the transcript, Judge II had likely never heard of Parental Alienation Syndrome before the January 4, 2008 hearing. Essentially, the trial court started with the assumption that Lewis had Parental Alienation Syndrome and placed the burden on her to prove that she did not.
 B. Lewis's Mental Health and the Trial Court's Analysis {¶ 83} For the foregoing reasons, we do not find competent and credible evidence in the record that Lewis exhibits signs of either Munchausen Syndrome by Proxy or Parental Alienation Syndrome. The trial court's findings in these areas are against the manifest weight of the evidence. Therefore, we find that the trial court abused its discretion to the extent it considered either Munchausen Syndrome by Proxy or Parental Alienation Syndrome when determining the best interest of the Child.
 {¶ 84} The trial court determined that Parental Alienation Syndrome made judicial intervention necessary. The court concluded that it "does not know *Page 20 
whether Defendant has Parental Alienation Syndrome but that it believes Defendant (and her family) have engaged clearly in two of the four criteria and the third (Deterioration in Relationship) and fourth (intense fear by child) criteria will exist if early judicialintervention does not occur." Plaintiffs Proposed Findings of Fact and Conclusions of Law Page 4 (emphasis added). The only witness qualified to testify called Lewis's actions "situationally appropriate" and not signs of Parental Alienation Syndrome. 2/20/08 transcript; p. 53, line 9. Nevertheless, the trial court stated that judicial intervention was necessary to counter the syndrome's effects.
 {¶ 85} And when analyzing the statutory factors outlined in R.C. 3109.04(F)(1), the trial court considered both Munchausen Syndrome by Proxy and Parental Alienation Syndrome. "The Court on at least two occasions order [SIC] psychological/psychiatric testing of the Defendant in order to determine if she exhibits signs of either Munchausen Syndrome by Proxy or Parental Alienation Syndrome. The Defendant failed to comply with either of these orders until February 8, 2008. The Court heard the testimony of the Licensed Professional Clinical Counselor that was presented by the defendant and was not persuaded by hertestimony." Plaintiff's Proposed Findings of Fact and Conclusions of Law, p. 8 (emphasis added). Because of the trial court's analysis, this factor weighed against Lewis and benefited Rice in determining the best interest of the Child.
 {¶ 86} The trial court had two factors under R.C. 3109.04(F)(1) in which to consider parental alienation. R.C. 3109.04(F)(1)(f) states that courts should *Page 21 
consider the "parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights." And R.C. 3109.04(F)(1) states that courts should consider whether "the residential parent * * * has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court." Based on Lewis's history of blocking access to the Child, the trial court decided both of these factors in Rice's favor. But the trial court decided a third factor in Rice's favor by discussing these same facts in a Parental Alienation Syndrome and mental health context. As a result, the trial court weighed the listed factors in R.C. 3109.04(F)(1) too heavily in Rice's favor. Therefore, we find that the trial court abused its discretion to the extent it considered Munchausen Syndrome by Proxy or Parental Alienation Syndrome in determining the best interest of the Child
 {¶ 87} Accordingly, we sustain Lewis's second assignment of error.
 IV. {¶ 88} In her third assignment of error, Lewis contends that designating Rice as the residential parent was against the best interest of the child.[2] We find that *Page 22 
three of the trial court's findings under R.C. 3109.04(F)(1) are not supported by competent and credible evidence.
 {¶ 89} Initially, as we discussed above, the trial court should not have considered Munchausen Syndrome by Proxy or Parental Alienation Syndrome when considering the best interest of the Child under R.C. 3109.04(F)(1)(e). This was against the manifest weight of the evidence and, therefore, an abuse of discretion. For the same reasons, the trial court abused its discretion when it considered Lewis's supposed Parental Alienation Syndrome outside of the factors specifically enumerated in R.C. 3109.04(F)(1).
 {¶ 90} Pursuant to R.C. 3109.04(F)(1)(d), the trial court considered the "child's adjustment to the child's home, school, and community[.]" The court said it "heard testimony as to the child's adjustment to her home, pre-school and community. * * * [Rice] testified that the child enjoyed her time with him; that she adapted well to his home and began to thrive while in his care." Plaintiff's Proposed Findings of Fact and Conclusions of Law Page 7-8. The court may have heard testimony that the Child thrived while in Rice's care, but there was no competent, credible evidence that the Child had adjusted to Rice's home, community, or future pre-school.
 {¶ 91} Rice had five different addresses in fifteen months. He was in the Marines when the case started. After being discharged from the Marines, Rice moved to San Diego, California in October 2006. In December 2006, Rice moved to Tampa, Florida. Sometime in 2007, he moved to a different apartment in Tampa. Rice then moved to Lakeside, California in January 2008. And at the *Page 23 
time of the February 20, 2008 hearing, he lived in Oceanside, California. The Child had not yet been to Rice's residence in Oceanside. Therefore, there was no evidence that the Child had adjusted to Rice's home or community. Rice testified that he had enrolled the Child in a pre-school in California. But again, there could be no evidence that the Child had adjusted to a pre-school she had never attended.
 {¶ 92} Pursuant to R.C. 3109.04(F)(1)(g), the trial court considered whether "either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor[.]" The trial court stated that Lewis had filed two contempt motions for nonpayment of child support, but the court "has withheld ruling on either of these motions." Plaintiff's Proposed Findings of Fact and Conclusions of Law Page 8. Regardless, there was evidence presented during the various hearings that Rice had failed to pay child support for extended periods of the Child's life. The trial court must follow the procedures described in R.C. 3109.04 to determine the best interest of the Child.Miller v. Miller (1988), 37 Ohio St.3d 71, 74. This includes considering the nonpayment of child support. Merely stating that it "withheld ruling" on Lewis's support motions does not adequately satisfy this factor, especially when there is competent and credible evidence that Rice had withheld child support.
 {¶ 93} We do find that competent and credible evidence supports the trial court's belief that Rice is the "parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights"; and that *Page 24 
Lewis "had continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court." R.C. 3109.04(F)(1)(f) (j). Lewis was found in contempt of court twice for violating court orders and spent time in jail on those contempt charges. Similarly, the record shows that Lewis tried to deny Rice visitation with the Child on numerous occasions, and that Lewis even fled with the Child for a very brief time before turning the Child over to Rice.
 {¶ 94} However, the trial court relied on too many factors that were not supported by competent and credible evidence to determine the best interest of the Child. Therefore, we find that the trial court abused its discretion in determining the best interest of the child.
 {¶ 95} Accordingly, we sustain Lewis's third assignment of error. We reverse the trial court's judgment and remand this cause to the trial court for further proceedings consistent with this opinion. We offer no opinion on the best interest of the Child, or whether Rice or Lewis should be declared the residential parent.
JUDGMENT REVERSED AND CAUSE REMANDED. *Page 25 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE REVERSED and this cause BE REMANDED to the trial court for further proceedings consistent with this opinion and Appellee pay the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J.: Concurs in Judgment Only.
Abele, J.: Concurs in Judgment and Opinion.
[1] Toward's report was not admitted into evidence.
[2] In its order adopting and approving the Plaintiff's Proposed Findings of Fact and Conclusions of Law, the trial court erroneously stated that there was a change in circumstance. Courts apply the change in circumstance test under R.C. 3109.04(E)(1) when a party seeks to modify a prior custody decree. However, the present case involves an initial custody determination; it is not a modification. Because of R.C. 3109.042, Rice and Lewis stand "upon equality when making the designation" of the residential parent. The trial court correctly applied the best interest of the child test under R.C. 3109.04(F). See, e.g., DeWitt v. Myers, Clark App. No. 08CA86, 2009-Ohio-807, at ¶ 15-16;In re Colvin, Guernsey App. No. 08CA5, 2008-Ohio-3927, at ¶ 12-22;In re Ramey (Dec. 22, 1999), Washington App. Nos. 98CA4, 98CA28. Since the trial court applied the correct test and made no findings under R.C. 3109.04(E)(1), it had no reason to state that there had been a change in circumstance. Therefore, we choose to ignore that finding as superfluous to the trial court's decision. *Page 1